IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| JANE DOE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>) Civil No. 4:11-cv-00043<br>PITTSYLVANIA COUNTY, VIRGINIA and )<br>BOARD OF SUPERVISORS OF )<br>PITTSYLVANIA COUNTY, VIRGINIA )<br>)<br>Defendants. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR LEAVE TO PROCEED USING PSEUDONYMS AND FOR PROTECTIVE ORDER**

**BACKGROUND**

This lawsuit challenges the policy and practice of the Pittsylvania County Board of Supervisors ("Board") to open its meetings with a Christian prayer. Plaintiff argues that this practice violates the Establishment Clause of the First Amendment to the United States Constitution. The plaintiff, a Pittsylvania County resident who attends most Board meetings, seeks a declaration that the policy and practice of opening Board meetings with sectarian prayers is unconstitutional, an injunction prohibiting such prayers, and nominal damages. Due to the highly personal and sensitive matters involved in Establishment Clause cases, the history of harassment and violence against Establishment Clause plaintiffs, the publicity surrounding the Board's action, and the animus expressed by the public regarding this case, the plaintiff requests an order permitting her to proceed under a pseudonym.

**ARGUMENT**

Though there is a presumption of openness for judicial proceedings, the Fourth Circuit has held that under appropriate circumstances, pseudonyms may be permitted when privacy or confidentiality concerns warrant anonymity. *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). The Fourth Circuit identified the following five non-exhaustive factors for district courts to consider in deciding whether to allow a party to proceed anonymously:

> Whether the justification asserted by the requesting party is merely to avoid the annoyance or criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Jacobson*, 6 F.3d at 238.

Applying these five factors, district courts in the Fourth Circuit have granted the use of pseudonyms when necessary to protect the plaintiffs' anonymity. *See, e.g. Nelson v. Green*, No. 3:06cv00070, 2007 U.S. Dist. LEXIS 23125 (W.D. Va. Mar. 28, 2007) (granting use of pseudonyms to plaintiffs challenging a determination that the plaintiff sexually abused his daughter); *Yacovelli v. Moeser*, No. 1:02cv596, 2004 U.S. Dist. LEXIS (M.D.N.C. May 20, 2004) (granting use of pseudonyms in a challenge by students of University's orientation program as violating the Establishment Clause and the Free Exercise Clause).

In this case, nearly every one of the factors weighs heavily in the plaintiff's favor.

**I. Religious Beliefs are a Highly Personal and Sensitive Matter**

Religious beliefs are "quintessentially private" matters. *Yacovelli v. Moeser*, No. 1:02cv596, 2004 U.S. Dist. LEXIS 9152 (M.D.N.C. May 20, 2004) (citing *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir 1981)). The "preservation and transmission of religious beliefs and

worship is a responsibility and a choice committed to the private sphere." *Lee v. Weisman*, 505 U.S. 577, 589 (1992). Disclosing the plaintiff's identity will exposes these sensitive and highly personal matters.

While the plaintiff's own religious and personal views may not be germane to the Establishment Cause issues in this case, unless granted anonymity, the nature of the controversy in this small community will publicize either the plaintiff's privately held religious beliefs, or the public's speculations about the plaintiff's religious faith. Even if the plaintiffs do not have to "directly state their religious affiliations, or lack thereof," plaintiffs will nonetheless have to explain their injuries—a requisite element to prove standing—which will necessarily "require [them] to reveal [their] beliefs concerning the proper interaction between government and religion" *Doe v. Barrow County*, 219 F.R.D. 189, 193 (N.D. Ga. 2003). "[S]uch concerns can implicate privacy matters similar to those associated with actual religious teachings and beliefs." *Id.* at 193. Even if the plaintiff's religious beliefs are not disclosed in litigation, the public will speculate in this most private of matters. *See*, *e.g.* Ex. 1 ¶ 7 (Decl. of Jane Doe) (noting that a person rallying in support of sectarian prayer at the September 6, 2011 Board meeting talked to her about "Jew speak.")

## II. Disclosing Plaintiff's Identity will Place Her at Risk of Retaliatory Harm

### A. Establishment Clause Plaintiffs Routinely Face Harassment and Other Forms of Retaliation, Including Physical Violence

The Plaintiff in this case faces a unique risk inherent in Establishment Clause cases. There is an alarming history of violence and threats of violence against Establishment Clause plaintiffs. In a case strikingly similar to this one, *Wynne v. Town of Great Falls*, 376 F.3d 929 (4th Cir. 2004), the plaintiff suffered extreme harassment at the hands of her neighbors after she sued to enjoin a town council from opening its meetings with sectarian prayers. Individuals

unhappy with the suit broke into the plaintiff's home and beheaded her pet parrot, leaving behind a note reading, "You're next!" *See* Christina Lee Knauss, *A Quiet Life No More,* THE STATE, Sept. 19, 2004, at D1.  In addition, several of the plaintiff's pet cats were killed and her pet dog was beaten.  *Id.*

This kind of retaliation is far from unusual in Establishment Clause cases.  For example, after Vashti McCollum brought a suit in 1945 objecting to the practice of allowing public school students to attend religious classes held in public school classrooms (*see Illinois ex rel. McCollum v. Bd. Of Educ.*, 333 U.S. 203 (1948)), her house was vandalized, she received hundreds of pieces of hate mail, and her sons were physically assaulted (*see* Robert S. Alley, WITHOUT A PRAYER: RELIGIOUS EXPRESSION IN PUBLIC SCHOOLS 84-89 (1996)).

In 1981, Joann Bell and Lucille McCord filed suit to block religious meetings and the distribution of Gideon Bibles in their children's schools.  *See Bell v. Little Axe Indep. Sch. Dist. No. 70,* 766 F.2d 1391 (10th Cir. 1985).  The plaintiffs' children were consequently branded as "devil worshipers."  Alley, *supra*, at 106.  "An upside-down cross was hung on thirteen-year-old Robert McCord's locker," *Id.,* and the Bells received threatening telephone calls.  "More than once a caller said he…was going to break in the house, tie up the children, rape their mother in front of them, and then 'bring her to Jesus.'"  *Id.* at 107-08.  The threats were far from empty: The Bells' home was burned down.  *Id.*

In 1994, Lisa Herdahl brought an action challenging prayer practices in her children's schools.  *See Herdahl v. Pontotoc County Sch. Dist.*, 887 F. Supp. 902 (N.D. Miss. 1995).  As a result, her children were called "atheists" and "devil worshippers" by their classmates. Stephanie Saul, *A Lonely Battle in Bible Belt: A Mother Fights to Halt Prayer a Miss. School*, NEWSDAY, Mar. 13, 1995, at A8.  Other children were threatened with beatings by their parents

if they were caught talking to, or playing with, the Herdahl children. Alley, *supra*, at 177. There were reports that a boycott would be organized against the convenience store where Lisa Herdahl worked. Saul, *supra*, at A08. Herdahl gave up her job "because of threats against her children." Alley, *supra*, at 182. And she received death threats and threats that her home would be firebombed. *Id.* at 186.

Similarly, the children of one of the plaintiffs in *School District v. Schempp*, 374 U.S. 203 (1963) (in which Bible reading in the public schools was held unconstitutional), were beaten on their way home from school, and their house firebombed. Alley, *supra*, at 98. The son of the plaintiff in *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir. 2000) (a challenge to prayer at school-related events), was "harassed at school almost daily." Jonathan Ringel, *Alabama Claims U.S. Court Order Denies Students' Right to Pray,* FULTON COUNTY DAILY REP., Dec. 4, 1998, at 1. And even though she was not a plaintiff but merely a vocal opponent of the school-prayer policy challenged in *Sante Fe Independent School District v. Doe,* 530 U.S. 290 (2000), Debbie Mason received threatening phone calls and was followed home by persons trying to scare her. Kenny Byrd, *Baptist Family Opposed to Football Prayer Feels Pressure*, BAPTIST STANDARD, June 12, 2000. Eventually, her husband and children became unable to find work in the town where they lived. *Id.*

Tammy Kitzmiller, the lead plaintiff in a high-profile case challenging a Pennsylvania school district's promotion of intelligent design, received death threats, among other hate mail. *Judgment Day: Intelligent Design on Trial* (PBS *NOVA* television broadcast Nov. 13, 2007); *see generally Kitzmiller v. Dover Area School District,* 400 F. Supp. 2d 707, 721-22 (M.D. Pa. 2005). New Jersey high-school student Matthew LaClair also received a death threat after he tape-recorded and publically objected to his history teacher's frequent proselytizing of students.

Tina Kelley, *Talk in Class Turns to God, Setting Off Public Debate on Rights,* N.Y. TIMES, Dec. 18, 2006, at B1.  After speaking out, LaClair was quickly ostracized by his classmates.  Matthew LaClair, *Scholarship Essay,* http://www.aclu.org/students/34399res20080314.html.

Tyler Deveny, the eighteen year-old plaintiff in *Deveney[1] v. Board of Education*, 231 F. Supp. 2d 483 (S.D.W. VA. 2002), endured a beating of his own after successfully challenging the invocation planned for his high-school graduation ceremony.  *See* Charles Shumaker, *Student Beaten for Prayer Suit, He Says,* CHARLESTON GAZETTE & DAILY MAIL, June 19, 2002, at 6D.  A group of eight teens evidently displeased with the outcome attacked Deveny in a public place, with one saying, "Oh, you hate God," before striking Deveny in the face.  *Id.*

Unlike Deveny, the Dobrich family—plaintiffs in *Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005)—did not suffer physical violence after challenging their public school district's practices of permitting teaches to proselytize and distribute Bibles to non-Christian students and of rewarding students who attended school-sponsored Bible clubs.  *See* David Bario, *A Lesson in Tolerance*, AM. LAWYER, July 2008, at 122.  But the harassment, anti-Semitic taunts, and veiled threats the family endured from fellow community members ultimately drove them to move to another county.  *Id.*

Plaintiffs challenging religious displays on public property have also experienced retaliation in recent years.  Anonka Jocham, the plaintiff in *Jocham v. Tuscola County*, 239 F. Supp. 2d 714 (E.D. Mich. 2003), received threatening phone calls and letters, and was the target of vandalism, after she challenged a private group's erection of a nativity scene on the lawn of her county courthouse.  *See* Margaret Downey, *Discrimination Against Atheists: The Facts,* FREE INQUIRY, June 2004, at 41, 43.  Margaret Downey wrote about Jocham's experiences after having endured similar harassment herself.  *See* Joseph A. Slobodzian & Jonathan Gelb,

---

[1] Mr. Deveny's last name was erroneously spelled "Deveney" in the case caption.

*Commandments Ruling Spurs Threats,* PHILA. INQUIRER, Mar. 8, 2002, at B1. As founder and president of Freethought Society of Great Philadelphia—the organizational plaintiff in *Freethought Society v. Chester County*, 334 F.3d 247 (3d Cir. 2003), a challenge to a Ten Commandments plaque displayed on a county courthouse's exterior wall—Downey received threatening emails and telephone calls, including one ending in the warning: "You're going to get it." *Id.*

And in a case from the Seventh Circuit challenging the display of Christian paintings by the City in a public park, Judge Cudahy gave this description of events surrounding the substitution of a new, anonymous plaintiff for the original, named one:

> The record indicates that the original plaintiff in this case, Richard Rohrer, was, in effect, ridden out of town on a rail for daring to complain about the City's conduct. The present plaintiff has concealed her identity to avoid suffering the same treatment. However much some citizens of Ottawa may disagree with the position that the plaintiffs have taken, however much they may think the plaintiffs annoying and overlitigious, the conduct of some of them has been deplorable.

*Doe v. Small*, 964 F.2d 611, 626 (7th Cir. 1992) (Cudahy, J., concurring in the judgment) (citations omitted).

### B. Publicity of Opposition to School Boards Actions has Generated Hostile Comments in Community

Plaintiff faces a particular threat of retaliation in this case, due to the publicity of the School Board's action. In telephone calls and email correspondence to the American Civil Liberties Union of Virginia (which represents the plaintiffs and has been publicly associated with the issue), and in online commentary to media accounts, individuals have expressed the desire to suppress minority view points, and have alluded to a desire for those in disagreement with the School Board's decision to leave Pittsylvania County or to descend to Hell. One email correspondent wrote, "If you don't like prayer leave Virginia you bunch of jerks. . . . I bet if

members wore id's saying they were with the aclu daily beating would be given to them." Ex. ___ (email from "gary jones," einstein24073, to ACLU of Virginia, August 16, 2011. Another wrote,"You cater to about 15% of the people that don't know how to pour pee out of a boot with the directions on the heel, and dont' (sic) listen to the 85% majority." Ex. ___ (email from "Danny Carlton," dwgroove@chatmosscable.com, to ACLU of Virginia, August 18, 2011). A caller to the ACLU of Virginia said that its legal director would "burn in hell," and another said she should be fired and "put in the dump." A third caller called the office manager names such as "devil-worshipper." Ex. ___ ¶ 2 (Jones-Fleming Decl.)

Public comments about the controversy display similar animus. In a letter to the editor of the Danville Register & Bee, one person wrote, "All the ACLU is doing is trying to justify the jobs of hundreds of attorneys; they don't give a hoot about what happens in your life as long as the checks keep coming." Ex. ___ Another wrote, "If there was ever a group of lawyers that needs to be run out of this country, it's the ACLU." Ex. ___. On the Register & Bee's comment section, a commenter wrote, "I'm thinking the aclu should simply stay the he! (sic) out of danville if they have such a problem with the way we do things. . . . let the aclu and the busybodies that represent it go to a country that isn't supposed to be free. . ONE NATION UNDER GOD, not one nation under a bunch of clones that are no better than racist pigs." Ex.1 p.1 (comments at *ACLU ponders lawsuit over Pittsylvania prayer*, Danville Register & Bee, August 19, 2011 (available at http://www2.godanriver.com/news/2011/aug/19/aclu-ponders-lawsuit-over-pittsylvania-prayer-ar-1249948/#fbcomments)). Another wrote, "The aclu can do what ever it wants to but when judgement (sic) day come (sic) they have to answer to our LORD Jesus Christ. He says that the ones that don't believe in him shall go in the PIT!!!!!!!" *Id.* p. 2. A third wrote, "The American people need to rise up and dissemble the ACLU. .they have been a

-8-

thorn in our side for way too long..They are our enemy.." *Id.* p. 3.  According to press reports, a local attorney who offered to defend the Board's actions in a lawsuit wrote that opposition to the Board's Christian prayers was an "assault by the devil."  Ex. ___ (*Meeting prayer support grows in Pittsylvania County*, Lynchburg News & Advance, August 18, 2011 (available at http://www2.newsadvance.com/news/2011/aug/18/meeting-prayer-support-grows-pittsylvania-county-ar-1247963/)).

The public opprobrium currently directed at the ACLU is likely to be directed at the plaintiff should her identity be disclosed. Under these circumstances, it is unsurprising that plaintiff Jane Doe fears retaliation should her association with this lawsuit become known.  Ex. 1 ¶ 5.

**III.  The Action is Against a Government Party**

"When a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing." *Yacovelli v. Moeser*, 2004 U.S. Dist. LEXIS 9152 (M.D.N.C. May 20, 2004);  S*ee, e.g. Doe v. Harlan County Indep. Sch. Dist*., 96 F. Supp. 2d 667, 671 (E.D. Ky. 2000); *Doe v. N.C. Central Univ*., 1999 U.S. Dist. LEXIS 9804, 1999 WL 1939248 at *4 (M.D.N.C. April 15, 1999).  Furthermore, "the filing of an action challenging the constitutional validity of government activity generally involves no injury to the Government's reputation, while an action against a private party can result in damage to the defendant's reputation as well as economic harm." *Doe v. Mertin*, 219 F.R.D. 387, 394 (E.D. Va. 2004) (internal quotation marks and citations omitted).  In this case, the defendant is a local government and, therefore, this factor favors the plaintiff.

**IV.  There is Little Risk of Unfairness to the Opposing Party.**

Finally, the Board will not be prejudiced by anonymity of the plaintiffs. The plaintiffs are challenging the constitutionality of the Board's actions, a matter to which the plaintiff's identity is not germane. As a government body, the Board's decisions affect thousands of students, parents, and community members. Protestation, anonymous or public, through litigation or through dialogue, is due course for government bodies. Granting anonymity to the plaintiff who challenges the Board's actions has little risk of unfairness and prejudice to the defendant.

V.     **Protective Order**

In order to ensure that plaintiff's identities are fully protected, plaintiff requests the entry of a protective order prohibiting defense counsel, Court personnel and any other person from disclosing plaintiff's identity, and providing that any documents containing plaintiff's identity be filed with the Court be filed under seal. A draft protective order is attached hereto as Exhibit 10.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that her Motion for Leave to Proceed Using Pseudonyms and For Protective Order be granted.

Respectfully submitted,

JANE DOE

By:

---

Rebecca K. Glenberg (VSB #44099)
Thomas O. Fitzpatrick (VSB #80364)
American Civil Liberties Union of Virginia
       Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
(804) 644-8080

Fax: (804) 649-2733
rglenberg@acluva.org
tfitzpatrick@acluva.org


Frank M. Feibelman (VSB #13877)
Cooperating Attorney for the ACLU of Virginia
5206 Markel Rd., Suite 102
Richmond, Virginia 23230
(804) 355-1300
FAX: (804) 355-4684
frank@feibelman.com


Dated:  September  26, 2011