IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

**SEALED**

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) Civil Action No. 4:11cv00043 |
| v. | ) |
| | ) |
| PITTSYLVANIA COUNTY, VIRGINIA and | ) |
| BOARD OF SUPERVISORS OF | ) By:  Michael F. Urbanski |
| PITTSYLVANIA COUNTY, VIRGINIA, | )       United States District Judge |
| | ) |
|     Defendants. | ) |

## APPENDIX

### TO THE MEMORANDUM OPINION ON PLAINTIFF'S MOTION FOR LEAVE TO PROCEED USING PSEUDONYMS AND FOR PROTECTIVE ORDER

### III.

The second factor outlined by the Fourth Circuit Court of Appeals in James v. Jacobson requires the court to consider "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties." 6 F.3d 233, 238 (4th Cir. 1993). Courts evaluating this factor place particular importance on the retaliatory nature of any threatened harm. See, e.g., Nelson v. Green, No. 3:06cv70, 2007 WL 984127, at *2 (W.D. Va. Mar. 28, 2007) (finding this factor did not favor anonymity where identification of plaintiff "could conceivably pose a risk of future mental harm, [but] that harm would not be 'retaliatory' in nature"); Qualls v. Rumsfeld, 228 F.R.D. 8, 12 (D.D.C. 2005) ("None of the evidence demonstrates that Doe plaintiffs are likely to face physical retaliation as a result of filing this lawsuit; therefore, they cannot proceed under pseudonyms."); Yacovelli v. Moeser, No. 1:02cv596, 2004 WL 1144183, at *7 (M.D.N.C. May 20, 2004) ("[E]mbarrassment and harassment are generally insufficient to demonstrate retaliatory harm."); Doe v. North

Carolina Cent. Univ., No. 1:98cv01095, 1999 WL 1939248, at *3 (M.D.N.C. Apr. 15, 1999) (notwithstanding affidavit from plaintiff's psychologist stating she will suffer emotional distress if identified, plaintiff did "not allege any potential retaliation or harassment if her name is released in court documents"); see also Does I-XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1071 (9th Cir. 2000) (holding plaintiffs need not prove they face a danger of physical injury when they face extraordinary retaliation such as deportation, arrest, and imprisonment); Doe v. Stegall, 653 F.2d 180, 186 (5th Cir. Unit A Aug. 1981) ("Evidence on the record indicates that the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed . . . ."); Doe v. Shakur, 164 F.R.D. 359, 362 (S.D.N.Y. 1996) ("Plaintiff's allegation that she has been subjected to death threats would provide a legitimate basis for allowing her to proceed anonymously."); Doe v. First Nat'l Bank of Chicago, 668 F. Supp. 1110, 1111 (N.D. Ill. 1987) (permitting parties to proceed pseudonymously after they became targets of threats and harassment).  Fear of humiliation and embarrassment or the threat of economic harm, standing alone, is not a sufficient reason to grant a motion to proceed pseudonymously.  See Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992); Qualls, 228 F.R.D. at 12; Shakur, 164 F.R.D. at 362.

In the instant case, plaintiff fears "that if [her] involvement were made public, [she] would experience social ostracism, harassment or threats from community members."  Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 5.  Specifically, she asserts that she would be subject to the same hostility expressed by members of the community on online discussion pages and in emails sent to her counsel, the American Civil Liberties Union of Virginia Foundation, Inc. ("ACLU").  Id. at ¶ 6.  While the court is mindful of plaintiff's concerns, the evidence presented does not

2

establish that plaintiff will be subject to retaliatory harm should her identity be revealed, and thus does not tip the scales in favor of anonymity.

### A.

As evidence of her risk of retaliatory harm, plaintiff first points to the "alarming history of violence and threats of violence against Establishment Clause plaintiffs." Mem. in Support of Pl.'s Mot. for Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Pl.'s Br."), Dkt. # 4, at 3. Plaintiff cites a number of cases dating as far back as 1945 in which Establishment Clause plaintiffs have faced harassment, retaliation, and physical violence. Id. But plaintiff's general fears of retaliation do not persuade the court of the need for pseudonymous litigation in this case. See Freedom From Religion Found., Inc. v. Cherry Creek Sch. Dist., No. 07-cv-02126-MSK, 2009 WL 2176624, at *5-6 (D. Colo. July 22, 2009) (where plaintiff cited three anecdotal accounts of religious discrimination and harassment from a book, the court held "the unsubstantiated potential for an adverse public reaction does not establish a compelling reason to depart from the requirements of Rule 10(a)"); Doe #1 v. Von Eschenbach, No. 06-2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007) (declining to grant an anonymity request where plaintiff's fears of retaliation were vague and unsubstantiated); Qualls, 228 F.R.D. at 12 (unsubstantiated and vague concerns did not show likelihood of retaliation). Courts have rejected "this type of 'it has happened before, therefore it *might* happen here' argument" as being insufficient to justify a protective order cloaking plaintiff in anonymity. Doe v. Beaumont Indep. Sch. Dist., 172 F.R.D. 215, 217 (E.D. Tex. 1997).

Indeed, some Establishment Clause plaintiffs in the past have been the victims of harassment and even violence at the hands of disapproving community members. But not every Establishment Clause plaintiff proceeding without a pseudonym is subjected to harassment and

violence. Merely citing some instances in which Establishment Clause plaintiffs have been victims of retaliatory conduct does not establish a risk of retaliatory harm for this particular plaintiff in these particular circumstances. See Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, No. 08-00359, 2008 WL 4755674, at *4 (D. Haw. Oct. 28, 2008) (finding news articles about physical attacks based on race, sex and disability "were not connected to any of the parties in this action, nor do they involve threats against anyone challenging Defendants' admissions policy"); see also Qualls, 228 F.R.D. at 12 ("None of the evidence demonstrates that Doe plaintiffs are likely to face physical retaliation as a result of filing this lawsuit; therefore, they cannot proceed under pseudonyms."). The historical treatment of Establishment Clause plaintiffs does not convince the court that a protective order is warranted in this case. However, it may serve as a backdrop against which the court views any threats directed toward this plaintiff. With that in mind, the court turns to the evidence plaintiff claims supports her fear of retaliatory conduct.

## B.

Plaintiff claims that she has been "alarmed by the virulent reactions of members of the community to the controversy surrounding sectarian prayers at Board of Supervisors meetings" and fears that she "would be subject to the same hostility" if people learned she is involved in this litigation. Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 6. The evidence of record supporting plaintiff's fear of "hostility" from Pittsylvania County residents consists of: (1) telephone calls and emails to her counsel; (2) letters to the editor of the local newspaper; (3) an August 18, 2011 newspaper article; (4) postings by internet subscribers on online discussions boards; and (5) a

comment made to her about "Jew speak" at the September 6, 2011 Board meeting.[1]  As detailed

below, none of this evidence persuades the court that plaintiff is at risk of retaliatory harm.

**1.**

Plaintiff first points to a series of emails and telephone calls to her counsel, the ACLU,

that she claims are representative of the kind of "public opprobrium" that will be directed at

plaintiff should her identity be disclosed.  Pl.'s Br., Dkt. # 4, at 9.  One such caller said ACLU

legal director Rebecca Glenberg was going to "burn in hell" for opposing Christian prayer.  Decl.

of Valerie Jones-Fleming, Dkt. # 4, at Ex. 3 ¶ 2.  Another said Glenberg should be "fired and

'put in the dump.'"  Id.  An email sent to the ACLU stated, "If you don't like prayer leave

Virginia you bunch of jerks.  I'm sick [of] you the aclu sticking thier [sic] noses where it does

not belong.  I bet if members wore id's saying they were with the aclu daily beating would be

given to them."  Pl.'s Br., Dkt. # 4, at Ex. 4.  Another email correspondent said, "You cater to

about 15 % of the people that don't know how to pour pee out of a boot with the directions on

the heel, and dont' [sic] listen to the 85 % majority.  Come on people, it [is] time to wake up and

smell the roses before groups like you ruin the country even more than it already is. . . .  I am

offended by your actions on this prayer issue on [sic] the Board of Supervisiors [sic] in

Pittsylvania Co. and I want to know what you plan to do about it."  Pl.'s Br., Dkt. # 4, at Ex. 5.

These phone calls and emails[2] do not show plaintiff is at risk of retaliation.  For one

thing, none of the sentiments expressed above is directed at plaintiff.  Rather, these criticisms are

aimed at the ACLU, a high-profile national civil rights organization.  The ACLU's work in the

civil rights field transcends its involvement in this case.  Plaintiff argues that should her identity

---

[1]  See Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 7.

[2]  Both emails were sent from accounts bearing what the court assumes is the author's name.  The phone calls, however, appear to have been made anonymously.

5

be made public, "she will attract at least as much venom" as the ACLU has in this case. Suppl. Mem. In Support of Mot. For Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Pl.'s Suppl. Br."), Dkt. # 32, at 1 n.1. But as discussed, infra, plaintiff's identity is already known to some, certainly to defendants, and there is no evidence that she has received similar calls or emails since she first asked the Board to cease its Christian prayer practice, prior to filing suit. Even if the communications referenced above had been directed at plaintiff instead of the ACLU, the fact remains that none of them is threatening. "While unpleasant and disturbing to the persons receiving them," Yacovelli v. Moeser, No. 1:02cv596, 2004 WL 1144183, at *7 (M.D.N.C. May 20, 2004), these phone calls and emails simply do not threaten retaliatory harm to plaintiff. In Yacovelli, plaintiffs introduced as evidence several emails they claimed were threatening. One email stated "you people suck a**. Why don't you all pack yourselves into a boat, go out into the middle of the ocean, and then set it on fire." Id. Another stated "may evolution make quick work of you and pople [sic] who think like you. . . ." Id. Unlike in the instant case, these sentiments appear to have been directed at the Yacovelli plaintiffs themselves.[3] Nevertheless, the court found that they did not threaten physical harm and held the second James factor tipped slightly in favor of the defendants. The same is true here. To be sure, the emails and phone calls to the ACLU are distasteful and offensive. But they do not establish that plaintiff is at risk of retaliatory harm.

## 2.

Plaintiff next points to six letters to the editor of the Danville Register and Bee published on August 30, 2011 and September 1, 2011. Plaintiff claims these letters are indicative of the

---

[3] This is not entirely clear from the face of the court's opinion, which states only that "Plaintiffs identify several allegedly threatening e-mails." 2004 WL 1144183, at *7. However, because the Yacovelli court goes on to find these emails "do not specifically threaten physical harm to the Plaintiffs" and separately analyzes emails sent to the Family Policy Network criticizing supporters of the plaintiffs' cause, it appears to this court that the "several allegedly threatening e-mails" referred to by the Yacovelli court had been directed at the Yacovelli plaintiffs.

tone of public commentary about this case. Pl.'s Br., Dkt. # 4, at Ex. 6-7. And that may well be true. But once again, the opinions expressed in these letters are directed at the ACLU, not at plaintiff. The authors voice their frustration with the ACLU generally, stating things such as, "If there was ever a group of lawyers that needs to be run out of this country, it's the ACLU. It all depends on who you are and what you say whether you have a right to say it or not. They have done more damage to this country than any group." Id. at Ex. 7. Another writer stated that by litigating cases such as this one, the ACLU is "trying to justify the jobs of hundreds of attorneys; they don't give a hoot about what happens in your life as long as the checks keep coming." Id. at Ex. 6. The authors also voice their opinions on issues such as religion's role in government, the intent of the Framers in drafting the Establishment Clause, and whether the stand taken by the Board in this case is the correct one. Id. at Ex. 6-7. "Lawsuits involving religion can implicate deeply held beliefs and provoke intense emotional responses." Doe ex rel. Doe v. Elmbrook Sch. Dist., 658 F.3d 710, 723 (7th Cir.), reh'g en banc granted (Nov. 17, 2011).[4] That is clearly what we see here. These writers urge readers of the Danville Register and Bee to "stand up for our religious rights guaranteed us by our Constitution" and to come to the September 6, 2011 Board of Supervisors meeting to support the Board. Pl.'s Br., Dkt. # 4, at Ex. 6-7. They do not harass or threaten harm in any respect. These letters, all signed by the authors, merely express six local citizens' opinions on the subject matter at hand. They are not probative of plaintiff's risk of retaliatory harm in this case.

### 3.

The same goes for the August 18, 2011 article published in the Lynchburg News & Advance. Pl.'s Br., Dkt. # 4, at Ex. 9. This article discusses the growing support for the Board's

---

[4] The Seventh Circuit's opinion affirming the district court's judgment that the school district's use of rented church space for graduation ceremonies did not violate the Establishment Clause was vacated pending rehearing en banc. A rehearing is scheduled for February 9, 2012.

7

position on the issue of Christian prayer. The two individuals interviewed for the article–one, a long-time host of a local religious radio show and the other a local attorney–both voiced opposition to the position taken by the ACLU. The Rev. R.J. "Brother Bob" Barber, host of "Tabernacle Time," stated he planned to lead a rally at the next Board meeting and urged "everyone in agreement with the board to stand up for 'our God-given' rights." Id. Barber expressed his view that "everyone should have the right to pray to their god," including, by implication, the Christian members of the Board and meeting attendees. Id. Attorney Ronald Williams stated he is "indignant and upset" at the ACLU's position in this case and referred to it as "idiotic" and "an assault by the devil." Id. The 74-year old Williams offered to represent the Board should the matter be brought into court and said "he is ready for battle" and "wants to go down fighting"[5] in his last years as a lawyer. Id. This article in no way establishes that plaintiff is at risk of retaliatory harm as a result of this litigation.

### 4.

Likewise, online commentary to an August 19, 2011 Danville Register and Bee article entitled *ACLU ponders lawsuit over Pittsylvania prayer,* does not create a risk of retaliatory harm. Plaintiff proffers as evidence a selection of comments posted by internet subscribers to this article and the responses to those comments. All of this commentary is associated with the individual internet subscriber's name. None of the comments mentions plaintiff. The ACLU is once again the topic of discussion as commenters proclaim that "the aclu should simply stay the he! [sic] out of danville," that "[t]he American people need to rise up and dissemble [sic] the ACLU . . . they have been a thorn in our side for way too long . . . They are our enemy . . .," and that "[t]he aclu can do what ever it wants to but when judgement [sic] day come [sic] they have

---

[5] By "go down fighting," it is clear that Williams refers to a legal battle.

to answer to our LORD Jesus Christ.  He says that the ones that don't beleve [sic] in him shall go

in the PIT!!!!!!!!"  Pl.'s Br., Dkt. # 4, at Ex. 8.  Some commenters champion their beliefs that

"[w]hen the ACLU and our out of control judges prevent prayer, they are violating the 1st

amendment big time. . . ."  Id.  Others maintain that the Board is violating the law by promoting

one religion over others and should be keeping business and personal beliefs separate.  Id.  These

commenters share their various interpretations of the First Amendment and reference their own

religious convictions.  But they do not threaten plaintiff.

     The online comments posted in response to the September 26, 2011 article in the

Danville Register and Bee entitled *ACLU sues Pittsylvania County over prayer* do mention

plaintiff but again contain no threats.  The relevant discussion reads as follows:

> CM:[6] people will do anything for money . . . just hope this person
> that was soooo offended is smart enough not to make himself
> known . . . it would not be a good thing I'm sure . . . just saying
> karma don't know God either.
>
> CM:  im offended that some spineless worm hiding behind the
> ACLU is offended . . . therefor [sic] im thinking i need counsel to
> sue them to get Danville's tax dollars back . . . just saying
>
> BH:  That's very Christian of you.
>
> DD:  Hey [CM]–Maybe we could sue the ACLU and this coward
> because we are offended that they are offended!!
>
> CM:  [DD] thats what im thinking . . . i figure if the worm can find
> someone to sue on his behalf why cant we chances are this
> individual isnt even from these parts or owes a lot of money for
> alimony or back child support lol
>
> KBM:  I think some of the posts have illustrated why there is a
> "Jane Doe" filing.  It is sometimes hard to determine what is an
> idle threat and those to be taken seriously.  Also, the filing was in
> Pittsylvania County, not Danville.

---

[6] Commenters are referred to herein by their initials.

CM:  [KBM] i dont think violence is ever an answer however i do believe that its worth checking into suing whomever it is for offending taxpayers wallets

DD:  [CM]–I agree.  I don't think violence is even an issue here.  If that is her stand on this issue then that is her stand.  Just think it is very cowardly to sue a county and not have the guts to come forward.

CM:  [DD] yep yep . . . well if she can sue the county then next its the president cuz [sic] i hear he is saying his prayers too . . . just saying

BH:  Yes, she could IF the president said a Christian prayer.  Which he's not going to, by the way.  He'll mention "God", but not a specific god.  That's what the ACLU is pushing for . . . a non-sectarian prayer.

SM:  did you not read they were suing for court costs only?  the BOS is breaking the law.  they are wasting our tax dollars on an issue that has a ton of case law behind it.  FIRE the BOS!

Pl.'s Reply Mem. in Support of Mot. for Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Pl.'s Reply Br."), Dkt. # 22, at Ex. 3.

There are a number of things to note about this colloquy.  First, there is no mention of any retaliatory harm that may be inflicted upon plaintiff.  In fact, the commenters who refer to plaintiff as a "coward" and a "spineless worm" both make affirmative statements of non-violence, dispelling any notion that their feelings towards plaintiff and this case could manifest themselves in the form of physical violence.  Secondly, it is important to note that these comments represent only some of the postings on this online discussion board.  This is not the entire universe of online commentary posted in reaction to media coverage of this lawsuit.[7] Without knowing how much online discussion there is on the subject and what the postings say,

---

[7] Indeed, it is clear from the face of Exhibit 8 to plaintiff's brief (Dkt. # 4) that this exhibit does not contain all of the comments and responses posted.  Exhibit 8 shows there are at least 20 other responses to various comments hidden from view on the page.

10

there is simply no way to tell how representative these comments are of the alleged "public opprobrium" plaintiff fears may be directed at her.

It is also worth noting that the <u>Danville Register and Bee</u>'s coverage of this lawsuit has stirred online debate among members of the community on both sides of the issue.  Even the limited sample of online commentary provided by plaintiff proves that the public reaction to this litigation is not one-sided.  Immediately following the series of comments referring to plaintiff as a "coward" is a commenter's view that "[t]he BOS is breaking the law . . . [and] wasting our tax dollars . . . FIRE the BOS!"  Pl.'s Reply Br., Dkt. # 22, at Ex. 3.  This online chatter is precisely the type of "overheated rhetoric common to passionate debate about significant social issues. . . ."  <u>Elmbrook Sch. Dist.</u>, 658 F.3d at 723.

This internet commentary does not establish plaintiff is at risk of retaliation.  Few of the comments even reference plaintiff directly, and those that do are not threatening.  In fact, the commenters criticizing plaintiff specifically disavow violence.  Lawsuits about religion "frequently ha[ve] a tendency to inflame unreasonably some individuals . . . ."  <u>Id.</u> at 724.  While "it cannot be denied that the record in this case contains some indications of disapproval and frustration by some local citizens for bringing this suit," <u>Doe v. Beaumont Indep. Sch. Dist.</u>, 172 F.R.D. 215, 217 (E.D. Tex. 1997), this evidence does not establish the need for anonymity.

This point is well-illustrated in a line of cases arising out of the District of Hawaii, in which the court found that hostile and threatening online comments, emails, and phone calls did not warrant anonymity.  In <u>Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate</u>, No. 08-00359, 2008 WL 4755674 (D. Haw. Oct. 28, 2008), the plaintiffs argued they would be subjected to physical, economic, and social harm from the public at large if their identities were disclosed.  They cited as evidence internet comments posted anonymously in response to news

11

articles about the litigation that are similar in tone to, and perhaps even more incensed and caustic than, those at issue in the instant case.

In his first opinion in Kamehameha Schools, the magistrate judge focused on four comments out of those initially offered into evidence that conceivably could have been directed at the plaintiffs. Id. at *4. The first two comments suggested it would be fun for the school to "celebrate Kill Haole[8] Day" and asked, "why go somewhere youre [sic] not wanted? Youre jus [sic] gonna get lickens everyday and drop out anyway, so why bother?" The magistrate judge dismissed these comments because they were aimed at "how Plaintiffs might be treated if they are admitted to Defendants' school," and the plaintiffs had stated explicitly that they were not fearful of retaliation at the school should they be admitted. Id. The third comment stated the plaintiffs and their families should be ashamed of themselves and called on Kamehameha Schools to "be the Warriors for all of us Hawaiians now." Id. The fourth comment regarding the plaintiffs' decision to bring the lawsuit stated, "What they're doing … will come around one way or another back to them. Karma do[es] happen." Id. (alteration in original). The magistrate judge held "[t]hese comments are not threats but do voice the commentators' frustration with this lawsuit, as do other comments in Plaintiff's Exhibits," and ultimately found this factor weighed in favor of denying anonymity. Id.

The parties then moved for reconsideration, offering additional evidence of reactions from the public to the lawsuit, which the plaintiff claimed "demonstrate convincingly that Plaintiffs' fear of harm if their identifies are revealed to the public is reasonable."[9] 2008 WL

---

[8] "'Haole' is a Hawaiian word often used to described a Caucasian person." Kamehameha Sch., 2008 WL 4755674, at *4 n.6 (quoting Chenoweth v. Maui Chem. & Paper Prods., Inc., No. 07-00092, 2008 WL 4107906, at *7 n.3 (D. Haw. Sept. 3, 2008)). The dispute in Kamehameha Schools centered around the school's admission policy of granting a preference to students with Hawaiian ancestry.

[9] The court evaluated the motion to proceed pseudonymously in Kamehameha Schools using the factors set forth by the Ninth Circuit in Does I-XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1068 (9th Cir. 2000): (1) the severity

5423191, at *1 (D. Haw. Dec. 31, 2008).  This evidence consisted of online comments referring

to the plaintiffs as "chicken s***," and stating "Sacrifice them!!!!!!!!"  Id.  An email sent to the

plaintiffs' counsel called him a "JEWISH S***HEAD" and stated, "if I see you ever in public

. . . no worries . . . I will SPIT on you . . . and YOU will throw the first punch . . . and believe me

. . . it will be my pleasure to beat the crap out of you. . . ."  Id. at *2.  One anonymous caller to

the plaintiff's counsel stated, "So good for you that everyone is going to know who your clients

are.  Now, both you and your haole clients can get the lickins' [sic] you deserve. . . ."  Id.

Notwithstanding this new evidence, the magistrate judge declined to reverse his previous

ruling denying anonymity.  The magistrate judge held that the new evidence "is of the same

character and nature as the evidence this Court previously considered and is no more probative

of a severe threat of harm or a reasonable fear of harm."  Id. at *3.  He noted that many of the

alleged threats were accompanied by statements of non-violence and that the proffered

comments were few among hundreds of internet comments posted in response to the news

articles on the litigation.  Id.  The court stated:

> [E]very major story posted online by the Honolulu Advertiser and
> Honolulu Star Bulletin stirs a parade of off-the-wall anonymous
> commentary.  Indeed, a hallmark of the internet is that people may
> post comments anonymously or under pseudonyms and the public
> may never know their true identities.  This invites commentators to
> make outrageous statements under a veil of secrecy.
>
> . . . .
>
> . . . .
>
> Plaintiffs' evidence confirms that, under the cloak of
> anonymity, people will make outrageous, offensive, and even
> nonsensical statements.  The evidence does not warrant anonymity,
> however.

---

of threatened harm; (2) the reasonableness of the plaintiffs' fears; (3) the plaintiffs' vulnerability to retaliation; (4)
the precise prejudice to defendants; and (5) whether the public's interest would be best served by requiring the
plaintiffs to reveal their identities.

Id. at *3-4.  The magistrate judge's opinion was upheld by the district court, 2009 WL 308351 (D. Haw. Feb. 6, 2009), and ultimately affirmed by the Ninth Circuit.  596 F.3d 1036 (9th Cir. 2010), reh'g denied, 625 F.3d 1182 (2010), cert. denied, 131 S. Ct. 2448 (2011).   The Ninth Circuit held that "[t]he magistrate judge correctly recognized that many times people say things anonymously on the internet that they would never say in another context and have no intention of carrying out."  596 F.3d at 1045.  The same is true with respect to the internet commentary posted in reaction to the instant case.[10]  The online discord over this litigation, distasteful and offensive as some of the comments may be, does not create a risk of retaliatory harm.

## 5.

Although plaintiff's identity apparently is no secret to the Board, her motion makes but one reference to any untoward comments directed at her.  In her declaration, plaintiff avers that at the September 6, 2011 Board meeting, "someone said something to me about 'Jew speak.' That comment, along with the general feeling of anger and defiance among those attending the meeting, made me feel uncomfortable and unsafe should my identity become known."  Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 7.  Plaintiff does not elaborate on the context in which this comment was made or what she perceived it to mean.  Certainly, such a comment can be considered to be offensive and unpleasant, but plaintiff does not assert, and the court cannot infer, that this comment was threatening or carried with it a risk of retaliatory harm.

## C.

Plaintiff also presents as evidence a copy of a letter she states she received on October 11, 2011 from someone purporting to be the Grand Dragon of the local Ku Klux Klan chapter.

---

[10]  The fact that the internet commentary offered as evidence in this case has commenters' names associated with it does not make it more likely that these people will inflict harm on plaintiff.  The court finds just the opposite to be true.  See United States v. Bagdasarian, 652 F.3d 1113, 1126 n.5 (9th Cir. 2011) ("The majority acknowledges that a speaker's anonymity can render a statement more threatening.").

Suppl. Decl. of Jane Doe, Dkt. # 22, at Ex. 1 Attach. A.  She asserts this letter makes her

"extremely fearful, as it indicates that [she is] being monitored by one of the most violent hate

groups in American history."  Id. at Ex. 1 ¶ 3.  She further claims to fear that if the Ku Klux Klan

confirms her identity, it will "target [her] for the kind of violence and intimidation for which the

group is known."  Id.  This letter, addressed to plaintiff and post-marked Callands, Virginia,[11]

reads in full:

9-29-2011

> Ms. Hudson
>      Thought you might be interested to know the K.K.K. met
> on Monday Night.  The meeting was not about the black
> community, it was about who made the complaint to the ACLU
> about prayer.
>      Your name was brought into the mix as a person of interest.
> We have instructed our atty. to file every F.O.I.A. available to
> verify the person that filed the complaint.
>      Will keep you posted!
>
>                    Grand Dragon
>                    X X X

Id. at Ex. 1 Attach. A.  Plaintiff acknowledges that this letter does not contain an explicit threat

but argues "the use of the K.K.K. name is inherently threatening."  Pl.'s Reply Br., Dkt. # 22, at

2.

     The Board, on the other hand, argues there is "no evidence that this is an authentic

communication from the 'Grand Dragon' of the local KKK."  Defs.' Suppl. Mem. In Support of

Opp. to Pl.'s Use of Pseudonyms (hereinafter "Defs.' Suppl. Br."), Dkt. # 33, at 3.  Regardless of

its authenticity, however, this letter is disquieting.  It clearly was sent in an effort to intimidate

plaintiff.  The Ku Klux Klan has a history in this country of brutal violence and instilling fear in

---

[11] Callands is in Pittsylvania County, Virginia.

its victims through harassment and intimidation.  A document professing to be a communication

from the Ku Klux Klan is not something the court takes lightly.

But it cannot be said that this letter threatens plaintiff or even contains a veiled threat of

violence.  The letter proves that the Ku Klux Klan strongly suspects plaintiff's identity and her

involvement in this litigation.  Yet there is no evidence that plaintiff has been subjected to any

harassment or violence, let alone the type of intimidation and threats of violence for which the

Ku Klux Klan is known, see, e.g., Virginia v. Black, 538 U.S. 343, 354 (2003) (noting Klan

often uses cross burnings as a tool of intimidation and a threat of impending violence), in the

months since the letter was sent.

By finding the letter not to be overtly threatening, the court in no way wishes to minimize

plaintiff's concerns.  Decisions such as this require a delicate balancing of factors, and the court

has considered the letter carefully in assessing the risk of retaliatory harm in this case.  The court

does not find, however, that it tips the scales in favor of anonymity.

### D.

In sum:

> With respect to the public at large, it cannot be denied that the
> record in this case contains some indications of disapproval and
> frustration by some local citizens for bringing this suit.  The threat
> of hostile public reaction to a lawsuit, however, "will only with
> great rarity warrant public anonymity."

Doe v. Beaumont Indep. Sch. Dist., 172 F.R.D. 215, 217 (E.D. Tex. 1997) (quoting Doe v.

Stegall, 653 F.2d 180,186 (5th Cir. Unit A Aug. 1981)).  This is not one of those rare cases like

Stegall where anonymity is justified.

Stegall involved a challenge to the constitutionality of prayer and Bible reading exercises

in Mississippi public schools.  The plaintiffs, a mother and her two children, moved for a

16

protective order that would allow them to proceed under fictitious names.  The plaintiffs feared "harassment and violence directed against the Roe family generally and the Doe children in particular" should their identities become known to the public.  653 F.2d at 182.  In support of their motion, the plaintiffs offered as exhibits local newspaper reports of the public's reaction to the lawsuit, as voiced at a school board meeting.  Id. at 182 n.6.  In one excerpt from an article quoted in the court's opinion, a school board member opined that the lawsuit was filed because the plaintiffs' lawyer, who was Jewish, "wants to destroy Christianity," and county residents stated, inter alia, that "Christians must beat the evil out of these people," and, that they "have got to band together and whop this evil thing." Id.  Reversing the district court's decision denying the plaintiff's request for anonymity, the Fifth Circuit found that "the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed to a Rankin County community hostile to the viewpoint reflected in plaintiffs' complaint." Id. at 186.  The court held that these threats of violence, taken in conjunction with the other factors weighing in favor of anonymity, especially the fact that the plaintiffs were children, tipped the scales "against the customary practice of judicial openness." Id.

Stegall is distinguishable from the instant case in two principal ways.  First, there is no record of any threat made against plaintiff in this case, and she has not established the likelihood of retaliatory physical harm. Cf. id. at 182 n.6 (county residents stated Satan was "working his evil on these people filing this suit" and that "Christians must beat the evil out of these people" and must "band together and whop this evil thing").  Secondly, this case does not involve a child-plaintiff, a factor the Stegall court found "especially persuasive." Id. at 186; see also id. at

186 ("[W]e view the youth of these plaintiffs as a significant factor in the matrix of considerations arguing for anonymity here.").[12]

"The potential for physical harm and the corresponding need for anonymity must be considered in light of the particular circumstances of each case and the factual record established by the moving party." Freedom From Religion Found. v. Cherry Creek Sch. Dist., No. 07-cv-02126-MSK, 2009 WL 2176624, at *6 n.6 (D. Colo. July 22, 2009). The record in this case does not support a finding that there is a risk of retaliatory harm to plaintiff. As such, this factor militates against anonymity.

## IV.

A few other factors not specifically identified by the court in James v. Jacobson,[13] but still relevant to this analysis, bear mention here.

The Board argues that plaintiff should not be permitted to proceed anonymously because she is a "public figure." Defs.' Mem. In Opp. to Pl.'s Mot. For Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Defs.' Br."), Dkt. # 16, at 5. At least one circuit specifically listed this as a factor to be considered by courts weighing requests for anonymity. In Doe v. Megless, 654 F.3d 404, 409-10 (3d Cir. 2011), the Third Circuit endorsed a non-exhaustive list of factors first articulated by the district court in Doe v. Provident Life & Acc. Ins. Co., 176 F.R.D. 464, 467 (E.D. Pa. 1997), to be weighed both in favor of anonymity

---

[12] The instant case also stands in contrast to cases such as Doe v. Porter, 370 F.3d 558, 561 (6th Cir. 2004) (upholding decision to allow plaintiffs to proceed pseudonymously given hostile environment in case involving "very young children, to whom we grant a heightened protection"), and Doe v. Barrow County, 219 F.R.D. 189, 193 (N.D. Ga. 2003) (a case not involving children but where, in addition to a hostile public reaction to the suit, at least one member of the community attempted to intimidate the judges of the court through angry and inappropriate phone calls).

[13] As noted in the Memorandum Opinion on Plaintiff's Motion for Leave to Proceed Using Pseudonyms and for Protective Order, the James court made clear that its list of factors was not meant to be exhaustive. 6 F.3d at 238.

and in favor of the traditional rule of openness.[14] <u>Megless</u>, 654 F.3d at 409.  One of the factors disfavoring anonymity is "whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant[s'] identities, beyond the public's interest which is normally obtained." <u>Id.</u> (citing <u>Provident Life</u>, 176 F.R.D. at 467-68).

Cases arising out of the Third Circuit and elsewhere provide little guidance in terms of who qualifies as a public figure in the context of an anonymity analysis.  At least one district court has suggested that the consideration of a public figure's involvement in a case is associated with "the public need to follow their activities in order to prevent abuse of some public trust." <u>Lozano v. City of Hazleton</u>, 496 F. Supp. 2d 477, 513 (M.D. Pa. 2007), <u>aff'd in part and vacated in part on other grounds</u>, 620 F.3d 170 (3d Cir. 2010), <u>cert. granted and judgment vacated and remanded</u>,131 S. Ct. 2958 (2011) (remanded for further consideration in light of <u>Chamber of Commerce v. Whiting</u>, 563 U.S. ___, 131 S. Ct. 1968 (2011)).

On the other hand, the court in <u>Megless</u> focused on the status of the defendants as public officials in analyzing this factor.  Considering the public interest in knowing the litigants' identities, the Third Circuit held that the interest was "heightened because Defendants are public officials and government bodies," thereby supporting disclosure of plaintiff's identity.[15] 654 F.3d at 411 (quoting <u>Doe v. Megless</u>, No. 10-1008, 2010 WL 3076246, at *4 (E.D. Pa. Aug. 5, 2010) (citing <u>Provident Life</u>, 176 F.R.D. at 468)).

---

[14] The Third Circuit found this <u>Provident Life</u> test had been applied without difficulty by district courts and did "not conflict with the tests that have been adopted by [its] sister circuits," such as the Fourth Circuit's <u>James</u> test. <u>Megless</u>, 654 F.3d at 408-09.

[15] This court previously discussed the fact that defendants are governmental entities <u>supra</u>, in § II. D. of the Memorandum Opinion on Plaintiff's Motion for Leave to Proceed Using Pseudonyms and for Protective Order.

The Board asserts that plaintiff has been an outspoken critic of the Board.  As a citizen of Pittsylvania County, she has written numerous letters to the editors of local news outlets espousing her views on a variety of topics including the Danville-Pittsylvania Regional Industrial Facility Authority, uranium mining, economic issues, and local political races.  Defs.' Br., Dkt. # 16, at 2, Ex. 2; Defs.' Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 26, at Ex. 1; Defs.' Second Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 37, at Ex. 1.  A number of these letters to the editor reference the Board.  Additionally, in her capacity as a lawyer, plaintiff has advocated on behalf of several clients who have filed lawsuits against the Board.  The Board asserts that "[p]laintiff's attempted use of a pseudonym in this case, after being the public 'tip of the spear' in numerous previous actions against the Board, is disingenuous and without merit."  Defs.' Br., Dkt. # 16, at 6.

For her part, plaintiff argues that her occupation as a practicing attorney does not make her "a person of general renown in the community."  Pl.'s Reply Br., Dkt. # 22, at 4.  The court agrees that plaintiff's legal work does not turn her into a public figure for purposes of this analysis.  But plaintiff has done more than merely represent clients suing the Board.  She has criticized the Board publicly, calling them "backward-looking," xenophobes, and perpetrators of "self-dealing and wasteful spending," and she has openly shared her personal beliefs on political and socials issues that impact the Board.  Defs.' Br., Dkt. # 16, at Ex. 2; Defs.' Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 26, at Ex. 1.  Most recently, plaintiff publicly opined that that the Board's chairman, Tim Barber, "has been incapable of performing any of the duties of [B]oard chairman that require him to read the English language."  Defs.' Second Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s

Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 37, at Ex. 1.  She also stated that the re-election of the vice chairman of the Board "is further tribute to the determination of our current [B]oard to preserve the status quo, namely that the absence of basic education skills and blatant displays of ignorance are acceptable criteria for holding the highest elected offices in Pittsylvania County government."  Id.  Clearly, plaintiff does not hide her disdain for the Board.[16]  Still, plaintiff's activities do not make her a holder of the public trust; the public does not have an interest in monitoring her activities to ensure its trust has not been breached.

While there is little case law defining "public figure" in the context of anonymity requests, there are cases defining "public figure" within the contours of First Amendment-driven defamation law.[17]  Three types of "public figures" appear in defamation law: (1) "involuntary public figures," who become public figures through no purposeful action of their own; (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) "limited-purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues.  Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1551-52 (4th Cir. 1994) (citing Gertz v. Welch, Inc., 418 U.S. 323, 345, 351 (1974)).  The evidence presented here does not establish that plaintiff occupies a position "of such persuasive power and influence," Gertz, 418 U.S. at 345, that she could be considered an "all-purpose public figure." Even assuming, without deciding, that plaintiff's letters to the editor and other similar activities turn her into a "limited-purpose public figure," she would only be considered a public figure with

---

[16] Indeed, the public nature of the stands plaintiff has taken against the Board on arguably controversial political and social issues undermines somewhat her argument that she is fearful of retaliation in this case.  Granted, the issues on which she has taken a public stand in the past did not involve plaintiff's personal religious beliefs, but her often-voiced public criticism of the Board demonstrates that she is no shrinking violet.

[17] The court makes no finding as to whether the defamation law definition of "public figure" is the correct one to apply in this context.

respect to the issues in which she invited "attention and comment" by thrusting herself "to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. The Board's Christian prayer practice does not appear to be one of the public controversies as to which plaintiff has thrust herself into the limelight.

That said, before the issue became a matter of public controversy, plaintiff made an open email request to the Board that it cease its practice of Christian prayer. Although plaintiff claims that she has not disclosed her participation in this suit to anyone other than her five closest friends, Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 3, she made no attempt to disguise her identity when she sent an email to Pittsylvania County Attorney Vaden Hunt, legal counsel to the Board, on August 11, 2011, stating:

> I[n] light of the 4th Circuit Court of Appeals['] recent ruling [i]n Joyner et al v. Forsyth County, N.C., No. 10-1232 (published), I am requesting that the Pittsylvania County Board of Supervisors be required to cease and desist naming Jesus Christ in the prayers that begin each and every meeting of the Pittsylvania County Board of Supervisors. To a non-Christian such as myself, the Supervisors' references to Jesus Christ as the guiding spirit in their invocation of a deity is not only offensive; it is also exclusionary and constitutes a political view that citizens in this County who do not subscribe to the tenets of Christianity and Jesus Christ are somehow "less than" and "unequal to" the majority population that does, including the elected officials making these invocations.

> I would appreciate your attention to this matter. Unlike Forsyth County, where the references were less than 100%, in Pittsylvania County the invocations "In Jesus['] name" have been 100%.

> Very truly yours,

> Barbara Hudson

Defs.' Br., Dkt. # 16, at Ex. 1. Plaintiff did not send this email anonymously, nor did she ask that her name be kept confidential or otherwise not be associated with this request that the Board cease naming Jesus Christ in its opening prayers. Certainly, she intended for this email to be

passed along, at the very least, to the members of the Board. There is no evidence to establish how many other people have seen this email or know that plaintiff sent it. But it is not lost on the court that plaintiff took no measures whatsoever to hide her identity in it. Even though plaintiff sent the email before this lawsuit commenced, it is not hard to make the connection between this email request that the Board stop invoking the name of Jesus Christ and the Establishment Clause lawsuit that soon followed.[18]

**V.**

As the Fourth Circuit noted in Joyner v. Forsyth County, "George Washington once observed that '[r]eligious controversies are always productive of more acrimony and irreconcilable hatreds than those which spring from any other cause.'" 653 F.3d 341, 355 (4th Cir. 2011) (quoting a Letter from George Washington to Edward Newenham (June 22, 1792)), cert. denied, ___ U.S. ___, 2012 WL 117559 (Jan. 17, 2012). For this reason, courts must engage in a careful balancing of factors in determining whether to allow a plaintiff to proceed anonymously in a case such as this.

Indeed, "[f]ew tenets of the United States justice system rank above the conflicting principles presented in this case: the transparency and openness of this nation's court proceedings and the ability of private individuals to seek redress in the courts without fear for their safety." Kamehameha Sch., 596 F.3d at 1038. The court is mindful of plaintiff's fears of retaliation. But the need for anonymity in this case is not so compelling as to override the "paramount importance of open courts." Id. at 1046. The court must consider "whether

---

[18] Courts have considered the extent to which plaintiff's identity has been kept confidential in weighing requests for anonymity. See Megless, 654 F.3d at 408; see also M.M. v. Zavaras, 139 F.3d 798, 803 (10th Cir. 1998) (finding anonymity not appropriate where those who presumably harbored animosity towards plaintiff already knew plaintiff's identity); Doe v. Beaumont Independent Sch. Dist., 172 F.R.D. 215, 217 (E.D. Tex. 1997) (same); Doe v. Hallock, 119 F.R.D. 640, 644 (S.D. Miss. 1987) (same); Doe v. Shakur, 164 F.R.D. 359, 362 (S.D.N.Y. 1996) (same).

23

identification poses a risk of retaliatory physical or mental harm" to plaintiff or, "even more critically, to innocent non-parties." James, 6 F.3d at 238. There is no evidence of any risk to non-parties here. And the evidence does not strongly suggest that plaintiff herself is at risk of retaliatory conduct. The record is full of "indications of disapproval and frustration by some local citizens," Doe v. Beaumont Independent School District, 172 F.R.D. 215, 217 (E.D. Tex. 1979), but there have been no threats made towards plaintiff. In fact, affirmative statements of non-violence appear amidst the alleged "virulent reactions," "hateful messages," and "hostility" posted on online discussion boards. Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 6. Even the letter purportedly sent by the Grand Dragon of the Ku Klux Klan cannot be read as a threat of violence. The court fully appreciates why this letter would be distressing to plaintiff. But mere receipt of the letter does not give rise to a risk of retaliatory harm.

The fact that: (1) this case invokes plaintiff's personal religious beliefs, "a quintessentially private matter," Stegall, 653 F.2d at 186; (2) this case involves a single constitutional question; and (3) the Board is not prejudiced by her use of a pseudonym, all militate in plaintiff's favor. Weighing strongly against anonymity, however, is the fact that plaintiff is an adult, a practicing lawyer, who in the past has taken public stands on controversial political and social issues that involve the Board. Plaintiff is not a minor who might be entitled to greater protection in this type of case. Perhaps the most significant factor in the calculus to be weighed by the court is the fact that plaintiff emailed the Board and took a position under her name demanding the same thing she seeks in this lawsuit. Nothing in her email request suggests confidentiality or raises any concern that her identity be masked. It is difficult, if not impossible, to square plaintiff's open email request to the Board that it cease its practice of Christian prayer with her request to the court a month later that she be allowed to proceed anonymously.

Weighing all of the equities, and under the circumstances present in this particular case, the court finds that the balance tips in favor of disclosing plaintiff's identity.  This is simply not one of those critical cases that warrants anonymity.  See James, 6 F.3d at 238.  Plaintiff's concerns "are not so extraordinary as to outweigh the inherent public interest in transparent judicial proceedings."  F.B. v. East Stroudsburg Univ., No. 3:09cv525, 2009 WL 2003363, at *4 (M.D. Pa. July 7, 2009).  As such, plaintiff's motion will be **DENIED**.

Entered:  February 3, 2012

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge