## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

| | |
|---|---|
| **JANE DOE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 4:11cv00043** |
| **v.** ) | |
| ) | |
| **PITTSYLVANIA COUNTY, VIRGINIA and** ) | **By:  Michael F. Urbanski** |
| **BOARD OF SUPERVISORS OF** ) | **United States District Judge** |
| **PITTSYLVANIA COUNTY, VIRGINIA,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM OPINION

This matter is before the court on a motion to dismiss filed by defendants Board of
Supervisors of Pittsylvania County and Pittsylvania County, Virginia (Dkt. # 14).[1]  The Board's
arguments in support of its motion advance a view of the law inconsistent with controlling
United States Supreme Court and Fourth Circuit Court of Appeals precedent.  As such, the
Board's motion must be **DENIED**.

### I.

The verified complaint alleges that the Board meets twice a month and regularly opens its
meetings with Christian prayer.  Verified Compl., Dkt. # 1, at ¶¶ 6, 8.  A member of the Board
delivers an opening prayer at each Board meeting, which prayer is "explicitly Christian in nature;
that is, it invokes the name of 'Jesus Christ' 'Jesus' or 'Christ.'"  Id. at ¶ 8.  The verified
complaint alleges that, for example, on August 17, 2010, the opening prayer was as follows:

> Gracious heavenly father, we thank you for the opportunity to
> address you, and thank you O Lord, because you made all of this
> possible.  You are our God, you are our King, you are the reason

---

[1] Defendant Board of Supervisors of Pittsylvania County is the governing body of defendant Pittsylvania County,
Virginia.  Defendants are hereinafter collectively referred to as "the Board."

> we are here. God, without you, and Jesus, without you, there
> would be no life on earth, and we would not be able to sit down
> and express our Christian values before the good people of
> Pittsylvania County. Amen.

Id. Plaintiff alleges that the audience is asked to stand while the prayer is delivered and the

supervisors and audience bow their heads. Id. at ¶ 9. Plaintiff alleges that, except in the case of

illness or infrequent scheduling conflicts, she has attended each Board meeting since October

2008 "because she believes it is important to observe and understand the workings of her local

government. She intends to continue attending every meeting." Id. at ¶ 10. Plaintiff alleges that

the Christian prayers convey to her the message that she and other non-Christian citizens are not

welcome at Board meetings; "create a perception that the Board is unlikely to treat non-

Christians fairly because they do not follow the Board's preferred faith;" and make her feel like

an outsider in her own community. Id. at ¶ 11. Plaintiff alleges that "as a citizen and resident of

Pittsylvania County [she] is entitled to attend meetings of her Board of Supervisors without

being subjected to prayers that advance and prefer one religion, Christianity, to the exclusion of

other religions that do not recognize the deity of Jesus, including but not limited to Judaism,

Islam and Hinduism." Id.

The verified complaint alleges that after reading about the Fourth Circuit's decision in

Joyner v. Forsyth County, 653 F.3d 341 (4th Cir. 2011),[2] decided on July 29, 2011, plaintiff

contacted the American Civil Liberties Union of Virginia Foundation, Inc., which sent an email

to each Board member "explaining that the precedents of the Supreme Court and the Fourth

Circuit Court of Appeals prohibit legislative meetings from being opened with sectarian prayers,

and asking the Board to cease its practice of such prayers." Verified Compl., Dkt. # 1, at ¶ 12.

The Board subsequently passed a written resolution on September 6, 2011 adopting a prayer

---

[2] The Supreme Court denied Forsyth County's petition for writ of certiorari on January 17, 2012. ___ U.S. ___,
2012 WL 117559 (Jan. 17, 2012).

policy. Id. at ¶ 14.  The resolution provides that "[i]n order to solemnize proceedings of the

Board of Supervisors it is the policy of the Board of Supervisors to allow for an invocation or

prayer to be offered before its meetings for the benefit of the Board of Supervisors." Id. at Ex. A

¶ 1.  Although the written policy provides that the prayer is to be delivered by a designated

member of the Board, it is not to be "listed or recognized as an agenda item for the meeting or as

part of the public business." Id. at Ex. A ¶ 2.  The written policy provides that the prayer is to be

voluntarily delivered on a rotational basis by a member of the Board who "shall deliver the

prayer or invocation in his or her capacity as a private citizen, and according to the dictates of his

or her own conscience." Id. at Ex. A ¶ 5.  As to the mechanics of the prayer, the written policy

provides that "[s]hortly before the opening gavel that officially begins the meeting and the

agenda/business of the public, the Chairperson of the Board of Supervisors shall introduce the

invocational speaker, and invite only those who wish to do so to stand for those observances of

and for the Board of Supervisors." Id. at Ex. A ¶ 10.  As to content, paragraph 6 of the written

policy provides as follows:

> 6.      No guidelines or limitations shall be issued regarding an
> invocation's content, except that the Board of Supervisors shall
> request by the language of this policy that no prayer should
> proselytize or advance any faith, or disparage the religious faith or
> non-religious views of others.

Id. at Ex. A ¶ 6.  The final paragraph of the written policy states:

> 11.     This policy is not intended, and shall not be implemented
> or construed in any way, to affiliate the Board of Supervisors with,
> nor express the Board of Supervisors' preference for, any faith or
> religious denomination.    Rather, this policy is intended to
> acknowledge and express the Board of Supervisors' respect for the
> diversity of religious denominations and faiths represented and
> practiced among the citizens of Pittsylvania County, Virginia.

Id. at Ex. A ¶ 11.

The verified complaint alleges that on the date the resolution was passed, September 6, 2011, "[p]rior to roll call, Supervisor Coy E. Harville delivered a Christian prayer." Id. at ¶ 14. The verified complaint further alleges that despite the passage of the resolution, "supervisors at the September 6, 2011, Board meeting stated their intention to continue praying in the name of Jesus Christ, and have, indeed, continued that practice." Id. at ¶ 16.

## II.

The Board has moved to dismiss the verified complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id. at 1949. When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). While the court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. The Supreme Court outlined its two-pronged approach as follows:

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a

4

> court should assume their veracity and then determine whether
> they plausibly give rise to an entitlement to relief.

Id. at 1950.  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## III.

The verified complaint alleges that the "sectarian prayers at meetings" of the Board violate the Establishment Clause of the First Amendment to the United States Constitution. Verified Compl., Dkt. # 1, at ¶ 17.  The Establishment Clause of the First Amendment, made applicable to the states and their political subdivisions through the Fourteenth Amendment, see Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947), commands that the government "shall make no law respecting an establishment of religion." U.S. Const. amend. I.  Specifically, the verified complaint alleges:

> 18.    The Board's policy, practice and custom of opening meetings with sectarian prayers have the purpose of advancing one particular faith to the exclusion of other religions.
>
> 19.    These prayers have the effect of advancing a particular faith by affiliating the government, i.e., Pittsylvania County, with Christianity.
>
> 20.    The sectarian prayers convey the impermissible message that Pittsylvania County and the Board of Supervisors endorse and favor Christianity.

Verified Compl., Dkt. # 1, at ¶¶ 18-20.

The Board raises three arguments as to why plaintiff's Establishment Clause suit should be dismissed, none of which has any merit.  The Board first argues that plaintiff's verified complaint fails to sufficiently plead that she has standing to bring this action despite binding Fourth Circuit precedent to the contrary.  Second, the Board erroneously asserts that the doctrine

of legislative immunity applies to a suit brought against the County and its Board of Supervisors, as opposed to a suit against members of the Board in their individual capacities. Likewise, the Board asserts that legislative immunity and a legislative testimonial privilege shield its sectarian prayer practice from a constitutional challenge when, in fact, those doctrines are applicable only to activities integral to lawmaking, which an opening invocation is not. Finally, the Board argues that the alleged practice of regularly opening its meetings with Christian prayer is lawful, but controlling Supreme Court and Fourth Circuit decisions compel the opposite conclusion. The court addresses each of these arguments in turn.

### A. Plaintiff Has Alleged Injury in Fact Sufficient to Confer Standing to Challenge the Board's Practice of Opening Board Meetings with Sectarian Prayer.

Plaintiff alleges that she has regularly attended Board meetings since October 2008 and intends to continue to do so. Id. at ¶ 10. Plaintiff objects to the Board's practice of opening its meetings with Christian prayer because she does not subscribe to the particular faith promoted by the Board's opening prayer; the prayers convey that she is not welcome at the meetings; the prayers create a perception that the Board is unlikely to treat non-Christians fairly; and the prayers make her feel like an outsider in her own community. Id. at ¶ 11. The Board asserts that these allegations do not sufficiently allege injury in fact.

The standing issue in this case is controlled by the Fourth Circuit's decision in Suhre v. Haywood County, 131 F.3d 1083 (4th Cir. 1997). Suhre involved a display of the Ten Commandments in the main courtroom of the Haywood County, North Carolina courthouse. Plaintiff viewed the display as a party to two court proceedings and four other meetings held in the courtroom. Rejecting Haywood County's standing challenge, the Fourth Circuit recognized that "[t]he injury that gives standing to plaintiffs in these cases is that caused by unwelcome direct contact with a religious display that appears to be endorsed by the state. Such personal

contact with state-sponsored religious symbolism is precisely the injury that was sufficient to confer standing in School District of Abington v. Schempp, 374 U.S. 203 (1963)." Suhre, 131 F.3d at 1086.

In Schempp, school children and their parents sued the school district, complaining of the school's practice of reading Bible verses and reciting of the Lord's Prayer each morning before classes began.  The Court had little difficulty finding that the students and their parents had standing to challenge the practice of school prayer:

> The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed.  These interests surely suffice to give the parties standing to complain.

374 U.S. at 224 n.9.  As the Fourth Circuit noted in Suhre, "Schempp thus recognized 'a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause' to those persons directly affected by alleged violations of the First Amendment."  131 F.3d at 1086 (citing Ass'n of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 154 (1970)).

Just as in Schempp and Suhre, plaintiff in this case has alleged direct contact with the sectarian prayer practices of the Board.  As such, plaintiff has alleged standing to pursue her Establishment Clause claim.

Contrary to the Board's argument, the Supreme Court's opinion in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464 (1982), supports plaintiff's standing in this case.  In Valley Forge, plaintiffs, residents of Maryland and Virginia, learned from a news release that certain surplus government property northwest of Philadelphia had been conveyed to the Valley Forge Christian College without any financial payment.  Plaintiffs sued, objecting to the property transfer on Establishment Clause

grounds.  Concluding that plaintiffs lacked standing to challenge the conveyance, the Court

reasoned:

> We simply cannot see that respondents have alleged an *injury* of
> *any* kind, economic or otherwise, sufficient to confer standing.
> Respondents complain of a transfer of property located in Chester
> County, Pa.  The named plaintiffs reside in Maryland and Virginia;
> their organizational headquarters are located in Washington, D.C.
> They learned of the transfer through a news release.  Their claim
> that the Government has violated the Establishment Clause does
> not provide a special license to roam the country in search of
> governmental wrongdoing and to reveal their discoveries in federal
> court.

454 U.S. at 486-87 (footnotes omitted).  In contrast to the plaintiff in this case, the Valley Forge

plaintiffs simply had no direct contact with the claimed Establishment Clause violation sufficient

to confer standing.  See Suhre, 131 F.3d at 1086.

In Suhre, the Fourth Circuit reached the same conclusion, stating, "[i]n Valley Forge the

Supreme Court confirmed that a proper Establishment Clause plaintiff must allege direct injury,

like that experienced by the Schempp plaintiffs, who 'were subjected to unwelcome religious

exercises or were forced to assume special burdens to avoid them.'  Valley Forge, 454 U.S. at

487 n.22 (discussing Schempp)."  131 F.3d at 1086.  This is not a case, as in Valley Forge, where

the plaintiffs' stake was a "mere abstract objection to unconstitutional conduct."  Id.  Rather, it is

plain that plaintiff, by alleging that she has personally heard the consistently Christian prayers of

the Board at its meetings, has alleged direct injury sufficient to confer standing to bring this

Establishment Clause challenge.[3]

---

[3] None of the other cases cited by defendants supports a contrary position.  In re U.S. Catholic Conference, 885 F.2d 1020 (2d Cir. 1989), concerned a challenge to the tax exempt status of the Catholic Church based on its public campaigning against abortion.  The court denied standing because the plaintiffs suffered no direct personal injury: "Here, the clergy plaintiffs have not been injured in a sufficiently personal way to distinguish themselves from other citizens who are generally aggrieved by a claimed constitutional violation.  For that reason, they lack standing."  Id. at 1024-25.  Likewise, in Allen v. Wright, 468 U.S. 737, 755 (1984), the Court found that plaintiffs challenging the

The Board also asserts that any claim of future harm is rendered speculative or moot by its passage of the September 6, 2011 resolution, which provides that "no prayer should proselytize or advance any faith, or disparage the religious faith or non-religious views of others." Verified Compl., Dkt. # 1, at Ex. A ¶ 6. Despite the nonsectarian tone of the September 6, 2011 resolution, the verified complaint alleges that "supervisors at the September 6, 2011, Board meeting stated their intention to continue praying in the name of Jesus Christ, and have, indeed, continued that practice." Id. at ¶ 16. Further, in paragraph 10 of the verified complaint, plaintiff indicates that "[s]he intends to continue attending every [Board] meeting." Id. at ¶ 10. As such, the verified complaint on its face states a plausible basis for plaintiff's assertion that she has been and will continue to be directly affected by the Board's regular references to Christianity in its opening invocations. See Wynne v. Town of Great Falls, 376 F.3d 292, 296 n.2 (4th Cir. 2004), cert. denied, 545 U.S. 1152 (2005) (holding that adoption of a similar prayer policy did not moot an Establishment Clause challenge where the Town Council continued its practice of sectarian prayer); Atheists of Fla., Inc. v. City of Lakeland, 779 F. Supp. 2d 1330, 1337 (M.D. Fla. 2011) ("Ultimately, because Plaintiffs contend not only that the City's official

---

tax exempt status of racially discriminatory private schools lacked standing because they were not personally subject to the challenged discrimination. In Kurtz v. Baker, 829 F.2d 1133 (D.C. Cir. 1987), a professor of philosophy and secular humanist objected to the exclusion of nontheists from delivering secular remarks during the period reserved for morning prayer in Congress. Plaintiff claimed that this practice stigmatized non-believers, which the court found insufficient to confer standing. "As Allen makes clear, allegations of stigmatic injury will not suffice to link a plaintiff personally to the conduct he challenges unless . . . the plaintiff personally has been denied a benefit." Kurtz, 829 F.2d at 1141. Similarly, the claimed stigmatization associated with the decision by the United States to open diplomatic relations to the Vatican was too remote and speculative to confer standing upon citizens opposed to that action. Americans United for Separation of Church and State v. Reagan, 786 F.2d 194, 201 (3d Cir. 1986); see also Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 219 (1974) (association of present and former members of the Armed Forces Reserve lacked personal stake and direct injury to challenge military reserve status of members of Congress); United States v. Richardson, 418 U.S. 166, 179 (1974) (taxpayer lacked standing to require public dissemination of the expenditures of the Central Intelligence Agency, the Court concluding that "to invoke judicial power the claimant must have a 'personal stake in the outcome,' or a 'particular, concrete injury,' or a 'direct injury;' in short, something more than 'generalized grievances'"). In contrast to the plaintiffs in each of these cases, plaintiff here alleges that she was directly injured and affected by personally witnessing the sectarian prayer practices of the Board. As such, she has sufficiently pled standing to challenge the Board's prayer practices under the Establishment Clause.

policy is unconstitutional, but also that the City is not actually following that policy, it can hardly be said that the enactment of Resolution 10-041 in this case is sufficient 'to render the original controversy a mere abstraction.'").

Finally, the Board asserts that there is no causal connection between any official Board action and the sectarian content of the invocations delivered by the individual Board members. There is no merit to this argument. The Fourth Circuit has repeatedly considered opening prayers at local government meetings to be government speech. For example, in Turner v. City Council of Fredericksburg, 534 F.3d 352 (4th Cir. 2008), cert. denied, 555 U.S. 1099 (2009), Retired Justice Sandra Day O'Connor, writing for the Fourth Circuit panel, rejected the same argument the Board raises here:

> It is true that Turner and the other Council members take some personal responsibility for their Call to Order prayers. But given the focus of the prayers on government business at the opening of the Council's meetings, we agree with the District Court that the prayers at issue are government speech.

Id. at 355. In Turner, as here, the opening prayers were delivered by a member of the governing board, 534 F.3d at 353, and the Fourth Circuit's conclusion that the opening prayer was government speech applies with equal force here. Likewise, in Wynne, Christian prayer by the members of the Town Council of Great Falls, South Carolina was found to be "simply not constitutionally acceptable legislative prayer." 376 F.3d at 301-02.

This conclusion makes sense. The Board controls the format and forum for the opening prayers. The prayers are delivered exclusively by Board members. No member of the public is afforded an opportunity to offer a prayer. By offering only Christian prayers, the Board has not attempted to create a public forum in which all are welcome to express their faiths. Rather, by praying to only one deity, the Board impermissibly wraps the power and prestige of the

10

Pittsylvania County government around the personal religious beliefs of individual Board

members.  Plainly, the practice is government endorsement of religion.[4]

Further, there is no constitutional significance to the fact that the opening prayer occurs

before the gavel falls and the Board begins its official business.  The Fourth Circuit's conclusion

in Wynne makes this point abundantly clear:

> Public officials' brief invocations of the Almighty before engaging
> in public business have always, as the Marsh [v. Chambers, 463
> U.S. 783 (1983)] Court so carefully explained, been part of our
> Nation's history.  The Town Council of Great Falls remains free to
> engage in such invocations prior to Council meetings.   The
> opportunity to do so may provide a source of strength to believers,
> and a time of quiet reflection for all.  This opportunity does not,
> however, provide the Town Council, or any other legislative body,
> license to advance its own religious views in preference to all
> others, as the Town Council did here.  The First Amendment bars
> such official preference for one religion, and corresponding official
> discrimination against all others.

376 F.3d at 302.

Indeed, in this regard, the written policy adopted by the Board mirrors that adopted by the

Forsyth County Board of Commissioners in Joyner.  As here, the written policy in Joyner

provided that the opening prayer would not be "'listed or recognized as an agenda item for the

meeting so that it may be clear the prayer is not considered a part of the public business.'"  653

F.3d at 344.  The Fourth Circuit nonetheless found the Forsyth County Board's sectarian prayers,

delivered before the official agenda commenced, to violate the Establishment Clause.  Thus, as

---

[4] Even in more difficult cases, where the government officials did not do the praying themselves, but rather called upon religious leaders from local congregations to deliver the invocations, the Fourth Circuit has considered the speech to be that of the government subject to Establishment Clause scrutiny.  Citing one such case, Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276 (4th Cir.), cert. denied, 546 U.S. 937 (2005), the court in Turner noted that "[t]he identity of the speaker, and the responsibility for the speech, was, in that case, less clearly attributable to the government than the speech here, because the speakers there were not government officials. Simpson nonetheless held that 'the speech . . . was government speech.'" 534 F.3d at 355 (quoting Simpson, 404 F.3d at 288).  Likewise, in Joyner, the Fourth Circuit held that the fact that the prayers were not delivered by governmental officials was not dispositive.  "It was the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation." 653 F.3d at 350.

in Joyner and Wynne, the fact that the Christian prayer is delivered by the Board prior to the opening gavel that officially begins the meeting does not alter the governmental endorsement of the prayer nor constitutionally immunize its sectarian character.

Accordingly, there is no merit to the Board's argument that plaintiff has failed to allege injury in fact sufficient to confer upon her standing to bring this action.

**B. The Speech or Debate Clause of the Constitution, and the Related Common Law Doctrines of Legislative Immunity and Legislative Privilege, Cannot Shield from Establishment Clause Scrutiny the Board's Practice of Regularly Opening Its Meetings with Christian Prayer.**

1. The Speech or Debate Clause Does Not Shield the Board's Sectarian Prayer Practice from Constitutional Review.

At oral argument, and in supplemental briefing, the Board argued that the Speech or Debate Clause of the United States Constitution prohibits anyone from questioning the words spoken by any member of a legislative body, essentially immunizing the Board and Pittsylvania County from an Establishment Clause challenge to government-sponsored prayer. This argument has no merit.

The Speech or Debate Clause reinforces the separation of powers and protects legislative independence. [5] See Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 502 (1975); United States v. Brewster, 408 U.S. 501, 507 (1972); Gravel v. United States, 408 U.S. 606, 624-25 (1972); Powell v. McCormack, 395 U.S. 486, 503 (1969); United States v. Johnson, 383 U.S.

---

[5] Article I, Section 6 of the United States Constitution provides as follows:

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony, and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. art. I, § 6.

169, 178 (1966); Tenney v. Brandhove, 341 U.S. 367, 373-74 (1951). The clause protects members of Congress "from inquiry into legislative acts or the motivation for actual performance of legislative acts," Brewster, 408 U.S. at 509, "from the burden of defending" certain suits, Dombrowski v. Eastland, 387 U.S. 82, 85 (1967) (per curiam), and "from the consequences of litigation's results," id.; see United States v. Helstoski, 442 U.S. 477, 487, 489 (1979); Doe v. McMillan, 412 U.S. 306, 318-19 (1973); Powell, 395 U.S. at 502-03, 505; Johnson, 383 U.S. at 173; Tenney, 341 U.S. at 377. In each case, the Speech or Debate Clause must be applied "in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government." Brewster, 408 U.S. at 508.

"The Federal Speech or Debate Clause, of course, . . . by its terms is confined to federal legislators." United States v. Gillock, 445 U.S. 360, 374 (1980). As such, it cannot provide immunity to the members of the Board. Nor does the Virginia Constitution provide the Board any cover for unconstitutional conduct. The Virginia Constitution contains a provision similar to the Speech or Debate Clause applicable to members of the Virginia General Assembly: "Members of the General Assembly shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest during the sessions of their respective houses; and for any speech or debate in either house shall not be questioned in any other place." Va. Const. art. IV, § 9. While this provision provides certain legislative immunity to members of the General Assembly for speeches made on the floor of that body, it is not, by its own terms, applicable to local governmental entities such as the Board.

For the same reason, there is no testimonial privilege applicable to bar admission into evidence the Board's Christian prayer practice at issue in this case. Again, the Speech or Debate Clause applies only to members of Congress, not to the Board. As such, any claimed evidentiary

13

privilege flowing from the Speech or Debate Clause's "shall not be questioned" language has no application to the Board or this case. Gillock, 445 U.S. at 374; Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 403-04 (1979).

>    2.   Nor Does Common Law Legislative Immunity Shield the Board's Prayers from Constitution Review.

The case law is clear that any legislative immunity[6] enjoyed by individual members of the Board must be rooted in the common law. See Lake Country Estates, 440 U.S. at 404-05; Bruce v. Riddle, 631 F.2d 272, 275 (4th Cir. 1980). Under the common law, local legislators, sued in their individual capacities, can be immune from civil rights suits brought under 42 U.S.C. § 1983 for actions taken "'in the sphere of certain legitimate legislative activity.'" Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (quoting Tenney, 341 U.S. at 376). There are two reasons why common law legislative immunity has no application to this case. First, such immunity only extends to Board members sued in their individual capacities, and does not shield the County and the Board, as entities, from constitutional review of their actions. Second, legislative immunity only applies to activities integral to the legislative process and does not embrace non-legislative acts such as opening prayers.

---

[6] "Legislative immunity does not, of course, bar all judicial review of legislative acts. That issue was settled by implication as early as 1803, see Marbury v. Madison, 1 Cranch (5 U.S.) 137, and expressly in Kilbourn v. Thompson, [103 U.S. 168 (1880),] the first of this Court's cases interpreting the reach of the Speech or Debate Clause." Powell, 395 U.S. at 503. "The purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." Id. at 505.

a.   Common Law Legislative Immunity Only Protects Individual Board
Members; Actions of the Board and County Remain Subject to Constitutional
Review.

"[T]he Supreme Court has left no doubt that municipalities and local governments are not

entitled to immunity from suits under section 1983." Berkley v. Common Council of Charleston,

63 F.3d 295, 296 (4th Cir. 1995), cert. denied, 516 U.S. 1073 (1996) (citing Leatherman v.

Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166 (1993)); Owen

v. City of Independence, 445 U.S. 622, 650 (1980).  The Fourth Circuit in Berkley concluded

"that a municipality is not immune from section 1983 liability for unconstitutional enactments

and other legislative activities of the local legislature." 63 F.3d at 296.  As the Berkley court

explained:

> Our holding today that a municipality does not enjoy
> immunity with respect to the acts of its legislative body . . . should
> come as no surprise.  In fact, every other circuit that has considered
> this issue has either held or presumed that a municipality is not
> entitled to absolute legislative immunity for suits brought under
> section 1983.

Id. at 300.

As in Berkley, plaintiff herein has not sued the members of the Board in their individual

capacities; rather, the suit names only Pittsylvania County and its governing body, the Board.

The Fourth Circuit in Berkley rejected the extension of legislative immunity to the governmental

entity itself, and the same reasoning applies here:

> In the face of overwhelming authority, the City of Charleston
> attempts to justify its claim of absolute legislative immunity by
> reference to the tradition and policy justifications supporting the
> legislative immunity for individual legislators.  While there is
> indeed a long tradition of granting individual legislators at all
> levels of government a broad immunity from suits based upon their
> legitimate legislative activities, and though there are undoubtedly
> strong public policy justifications for such immunity, the Supreme
> Court has instructed that the defenses available to an official in a

15

personal capacity action simply "are unavailable" in a suit against a governmental entity.

Id. at 300-01.[7]

The holding in Berkley is amply supported by Supreme Court precedent. See, e.g., Bogan, 523 U.S. at 53 ("Municipalities themselves can be held liable for constitutional violations."). As the Court noted in Owen, "[t]he concerns that justified [granting individual immunity from personal liability to governmental officials] in those decisions, however, are less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue." 445 U.S. at 653. The Owen Court stated "that the justifications for immunizing officials from personal liability have little force when suit is brought against the governmental entity itself." Id. at 653 n.37. The Owen Court concluded that "our decision holding that municipalities have no immunity from damages liability flowing from their constitutional violations harmonizes well with developments in the common law and our own pronouncements on official immunities under § 1983." Id. at 657. In Lake Country Estates, the Court noted that while individual members of the Tahoe Regional Planning Agency ("TRPA") had immunity for legislative activities, the agency itself did not: "If the respondents have enacted unconstitutional legislation, there is no reason why relief against TRPA itself should not adequately vindicate petitioners' interests." 440 U.S. at 405 n.29 (citing Monell v. N.Y. City Dep't of Social Services, 436 U.S. 658 (1978)). Referencing its decisions in Owen and Monell, the Court in Leatherman stated, "[t]hese decisions make it quite clear that, unlike various government officials, municipalities do

---

[7] The early procedural history of the Suhre case also speaks to this issue. The district court initially dismissed the Establishment Clause challenge to the Ten Commandments display in the Haywood County courthouse on legislative immunity grounds, holding that the county commissioners, the county manager, and the county itself were all immune from suit. Suhre v. Bd. of Comm'rs, 894 F. Supp. 927, 932-33 (W.D.N.C. 1995). After that ruling, and while the case was on appeal, the Fourth Circuit decided Berkley. Based on its ruling in Berkley, the Fourth Circuit affirmed the dismissal of the individual defendants in Suhre, but reversed and remanded the case as to defendant Haywood County, "leaving the County, through the Board of Commissioners, as the only defendant." Suhre, 131 F.3d at 1085.

not enjoy immunity from suit–either absolute or qualified–under § 1983." 507 U.S. at 166.

Therefore, common law legislative immunity has no application to the institutional defendants in

this case.

      b.  <u>Common Law Legislative Immunity Applies Only to Legitimate Legislative
Activities, Not to Opening Prayers.</u>

The second reason why legislative immunity has no application to this case is because

legislative prayer is beyond the proper scope of common law legislative immunity.  The purpose

of legislative immunity is "to protect the integrity of the legislative process by insuring the

independence of individual legislators." <u>Brewster</u>, 408 U.S. at 507.  As such, legislative

immunity only applies "in the sphere of legitimate legislative activity." <u>Tenney</u>, 341 U.S. at

376-77 ("This Court has not hesitated to sustain the rights of private individuals when it found

Congress was acting outside its legislative role."); <u>see</u> <u>Brewster</u>, 408 U.S. at 528 (legislative

immunity afforded by the Speech or Debate Clause "does not prohibit inquiry into activities that

are casually or incidentally related to legislative affairs but not a part of the legislative process

itself"); <u>Alexander v. Holden</u>, 66 F.3d 62, 65 (4th Cir. 1995) ("Legislative immunity only

attaches to legislative actions."); <u>Brown & Williamson Tobacco Corp. v. Williams</u>, 62 F.3d 408,

415 (D.C. Cir. 1995) ("The Clause is not, to be sure, a blanket prohibition on suits against

congressmen.  It protects only those congressional acts properly thought to fall within the

legislative function–those 'generally done in a session of the House by one of its Members in

relation to the business before it.' <u>Kilbourn v. Thompson</u>, 103 U.S. 168, 204 (1881)."); <u>Bruce</u>,

631 F.2d at 279 (legislative immunity applies to "legislators of any political subdivision of a

state function[ing] in a legislative capacity"); <u>Greenburg v. Collier</u>, 482 F. Supp. 200, 202 (E.D.

Va. 1979) ("Only those activities properly termed legislative are protected from inquiry by the

speech or debate clause.").  In <u>Bogan</u>, the Court found the actions of the Mayor of Fall River,

17

Massachusetts in introducing a budget and signing an ordinance into law to be protected by the doctrine of legislative immunity because "they were integral steps in the legislative process." 523 U.S. at 55. Here, in contrast, nothing about the Board's sectarian prayer practice approaches such an integral legislative step.

Though not recognized by the Board in argument or briefing, the leading legislative prayer case of Marsh v. Chambers, 463 U.S. 783 (1983), did, in fact, involve consideration of the intersection of legislative immunity and legislative prayer. The Eighth Circuit Court of Appeals' decision expressly rejected the argument that the Nebraska Legislature's prayer practice could not be challenged because it is subject to legislative immunity, stating, "[t]he defendants argue that the chaplain's prayers constitute immune speech and that virtually every act relating to the prayers–the rules requiring such prayers and the compensation paid therefor–are legislative acts immune from challenge." Chambers v. Marsh, 675 F.2d 228, 232 (8th Cir. 1982), rev'd on other grounds, 463 U.S. 783 (1983). The Eighth Circuit rejected the legislative immunity argument, concluding as follows:

> Here, no speech activity by any legislator is at issue. Moreover, the deliberative process of the legislature will not be impaired to any degree by judicial resolution of the claim brought by Chambers. The prayer practice, as the district court found, bears no substantive relation to the process of enacting legislation. Nor is the independence of any individual legislator threatened by this action. See United States v. Brewster, 408 U.S. 501 (1972). Individual prayer by legislators is not at issue. We hold that legislative immunity does not bar an otherwise proper First Amendment challenge to the formal, established practice of the Nebraska legislature by which it compensates a chaplain to open each session with prayer.

Marsh, 675 F.2d at 232-33. In their certiorari petition to the Supreme Court, the Nebraska legislative officials sought review of the Eighth Circuit's holding that legislative immunity does not bar an Establishment Clause challenge to the prayer practice of the Nebraska Legislature.

Marsh, 463 U.S. at 786 n.4. In its ensuing decision, the Court left undisturbed the Eighth

Circuit's decision rejecting the extension of legislative immunity to legislative prayer. See id. at

785-86. Moreover, the Court's opinion nowhere suggests that it did not have jurisdiction or that

it was otherwise barred by the doctrine of legislative immunity from reaching the merits of the

Establishment Clause challenge to the prayer practices of the Nebraska Legislature. As such, the

history of the Marsh decision supports the proposition that legislative immunity does not bar an

Establishment Clause challenge to legislative prayer.

Likewise, the district court in Kurtz v. Baker, 630 F. Supp. 850, 856 (D.D.C. 1986), rev'd

on other grounds, 829 F.2d 1133 (D.C. Cir. 1987), cert. denied, 486 U.S. 1059 (1988), rejected a

Speech or Debate Clause challenge to the legislative prayer practices of Congress, ruling that no

immunity applied because "[t]he practice of legislative prayer does not provide meaningful input

into . . . legislative decision making." In a dissent filed to the District of Columbia Circuit Court

of Appeals' opinion reversing the district court in Kurtz on standing grounds, then-Circuit Justice

Ruth Bader Ginsburg wrote "[i]n accord with the district court, I find no threshold blockage to

Kurtz's claim against the chaplains and Treasury officers by reason of the Speech or Debate

Clause. While inspirational, prayer in Congress does not appear to be 'integral to lawmaking.'"

Kurtz, 829 F.2d at 1146 n.2 (Ginsburg, J., dissenting).

To be sure, Marsh and Kurtz involved prayers by legislative chaplains, rather than

individual legislators. Regardless, these cases squarely reject the argument that opening prayers

are activities integral to lawmaking and subject to legislative immunity. Likewise, in this case,

the Board's policy provides that "[t]he prayer shall not be listed or recognized as an agenda item

for the meeting or as part of the public business." Verified Compl., Dkt. # 1, at Ex. A ¶ 2. Such

activities, only "casually or incidentally related to legislative affairs," Brewster, 408 U.S. at 528,

and not "part and parcel of the legislative process," Gravel, 408 U.S. at 626, are outside the realm of protection afforded by the doctrine of legislative immunity.

      3.   The Board's Practice of Opening Its Meetings With Christian Prayer Is Not Shielded From Constitutional Review by Any Testimonial Privilege.

The Board's argument that its sectarian prayer practices are protected by a testimonial privilege and are beyond constitutional review likewise misses the mark.  In contrast to the privilege enjoyed by members of Congress under the Speech or Debate Clause, there is no absolute "evidentiary privilege for state legislators for their legislative acts." Gillock, 445 U.S. at 373.  Nor has the Court recognized an absolute testimonial privilege for state or local legislators in civil cases.  In Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), the Court declined to declare all judicial inquiries into legislative motivation to be off-limits, stating, "[i]n some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of official action, although even then such testimony frequently will be barred by privilege." Id. at 268; see also Marylanders for Fair Representation, Inc. v. Schaefer, 144 F.R.D. 292, 304 (D. Md. 1992) (Murnaghan, J. and Motz, J., concurring) ("The doctrine of legislative immunity (both in its substantive and testimonial aspects) . . . does not . . . necessarily prohibit judicial inquiry into legislative motive where the challenged legislative action is alleged to have violated an overriding, free-standing public policy.").

Testimonial exclusionary rules and privileges are not favored.  This is so because they "contravene the fundamental principle that 'the public . . . has the right to every man's evidence.'" Trammel v. United States, 445 U.S. 40, 50 (1980) (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)).  Privileges consequently must be "strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence

has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" Id. (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

There are several reasons why legislative testimonial privilege has no application to this case. First, as the Board's opening prayers do not fall within the sphere of legitimate legislative activities, it cannot be credibly argued that any common law evidentiary privilege applies to this case. See EEOC v. Wash. Suburban Sanitary Comm'n, 666 F. Supp. 2d 526, 531 (D. Md. 2009) ("[T]he privilege is only permitted to protect actions that are considered legislative."), aff'd, 631 F.3d 174 (4th Cir. 2011). Unlike the sectarian prayers at issue here, "[l]egislative acts, the ones for which the immunity and privilege are granted, typically involve the adopt[ion of] prospective, legislative-type rules, rules that establish[ ] . . . a general policy affecting the larger population." Wash. Suburban Sanitary Comm'n, 631 F.3d at 184 (internal quotations and citation omitted). Because the Board's opening prayers are not legislative actions, there is no legislative privilege associated with the Board's sectarian prayer practice.

Second, even if a common law legislative testimonial privilege were to attach, it would not preclude the court from examining the constitutionality of the public prayers of the Board. The challenged conduct in this case consists entirely of words spoken as opening prayers in a public forum. While "the legislative privilege may shield legislators . . . from testifying about non-public matters related to legislative conduct," Kay v. City of Rancho Palos Verdes, No. 02-03922, 2003 WL 25294710, at *10 (C.D. Cal. Oct. 10, 2003), the privilege cannot shield public actions of the Board from constitutional scrutiny.

Indeed, there is no need to inquire into the motives of any individual Board member or the Board's deliberative processes because the challenged prayers were spoken aloud and in

public for all to hear.  Thus, the evidence central to this case involves no challenge to legislative independence, works no interference with the legislative process, nor poses any threat to its integrity.  Allowing the court to assess the constitutionality of the words spoken by the Board members in public meetings poses no burden to those members.  None of the traditional policy rationales applicable to the doctrines of legislative immunity or privilege have any application here.  In contrast, there is a very strong federal interest in the enforcement of civil rights statutes that provide remedies for violations of the Constitution.  See, e.g., Mitchum v. Foster, 407 U.S. 225, 242 (1972) ("The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights–to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'"); see also United States v. Irvin, 127 F.R.D. 169, 174 (C.D. Cal. 1989) (legislative privilege of county board of supervisors must yield to the need for disclosure to enforce Voting Rights Act); East End Ventures, LLC v. Inc. Village of Sag Harbor, No. 09-3967, 2011 WL 6337708, at *4 (E.D.N.Y. Dec. 19, 2011) ("Because the subject matter on which Plaintiffs seek testimony is one of the central issues in this case, the legislative privilege is inapplicable.").  In sum, the Board's sectarian prayer practices are not shielded from constitutional review by grasping at the inapplicable straw of legislative testimonial privilege.

Finally, in Joyner, Turner, Simpson, and Wynne, the Fourth Circuit recently decided four legislative prayer cases involving local governmental entities and their governing bodies, and neither legislative immunity nor privilege precluded the court from reaching the merits of the

Establishment Clause issue.  For all of these reasons, the doctrines of legislative immunity and privilege have no application to this case.[8]

### C.   Supreme Court and Fourth Circuit Precedent Compel the Conclusion that the Board's Practice of Regularly Opening Its Meetings with Christian Prayer Violates the Establishment Clause.

Disagreeing with the clear holdings of the Fourth Circuit on the unconstitutionality of sectarian legislative prayer, the Board argues that its practice of Christian prayer is constitutional.  Bound by controlling Fourth Circuit precedent, the court must reject the Board's argument.

In Wynne, decided in 2004, and Joyner, decided this past summer, the Fourth Circuit makes it very clear that a local government violates the Establishment Clause by opening its meetings with sectarian prayer.  The Supreme Court denied certiorari review in each case.  Those decisions are the law of this circuit and binding precedent on this court.

The facts in Wynne bear a strong resemblance to this case.  There, the Town Council of Great Falls, South Carolina opened its meetings with a prayer led by a member of the Council.

---

[8] Nor does the political question doctrine, raised by the Board in passing in its Supplemental Brief, Dkt. # 34, bar review of the Board's sectarian prayer practice.  Under the political question doctrine, "the judiciary is deprived of jurisdiction to assess decisions exclusively committed to a separate branch of government."  Taylor v. Kellogg Brown & Root Services, Inc., 658 F.3d 402, 407 n.9 (4th Cir. 2011).  As the Court outlined in Baker v. Carr, 369 U.S. 186, 217 (1962):

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Rather than demonstrate "a textually demonstrable constitutional commitment of the issue to a coordinate political department," id., the Establishment Clause commands that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  The issue in this case is not political or one committed to the discretion of the legislature.  Rather, it is a fundamental right secured by the Constitution and protected by the courts.

Wynne, 376 F.3d at 294.  Each of the Council members was Christian, and the opening or closing portion of the prayers frequently referred to "Jesus," "Jesus Christ," "Christ," or "Savior."  Id.  During the prayers, citizens attending the meetings customarily stood and bowed their heads, and town residents participated in the prayers by saying "Amen" at the end.  Id.  Wynne, a follower of the Wiccan faith, objected to the Town Council's practice of referring to "Jesus Christ" in its prayers and requested that the prayers be limited to God and that members of different religions be invited to give prayers.  Id. at 294-95.  The district court found that the Mayor responded at the meeting that the Council had always done it that way and was not going to change.  Id. at 295.  Wynne testified that thereafter she became very uncomfortable, and claimed to be ostracized and treated differently by the Council.  Id. at 295-96.  Her Establishment Clause suit followed.  Id. at 296.  After suit was filed, but before trial, the Town Council adopted a resolution providing, inter alia, that "[t]he invocation shall not contain or address any specific beliefs . . . of any specific religion."  Id. at 296 n.2.  Regardless, after adoption of the resolution, the Mayor announced that he would not prohibit any Council member from making a specific reference to "Jesus," "Jesus Christ," or "Christ."  Id.  As the resolution did not discontinue the practice of Christian prayer challenged by Wynne, the district court concluded that the resolution did not moot Wynne's request for injunctive relief, id., to which the Fourth Circuit agreed.

In Wynne, the Fourth Circuit discussed in detail the Supreme Court's legislative prayer decision in Marsh, and the further guidance on the proper scope of the Marsh decision provided by the Court in County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989).  The Fourth Circuit summarized the holding in Marsh as follows:

> In Marsh, the Court upheld the Nebraska legislature's practice of opening each session with a nonsectarian prayer led by a chaplain

24

paid with public funds.  The Court based this holding on an
extensive historical inquiry, concluding that since members of the
First Congress had authorized the appointment of paid chaplains
only three days before agreeing to the language of the
Establishment Clause, they could not have intended the
Establishment Clause "to forbid what they had just declared
acceptable." Id. at 786-90.  The Marsh Court also pointed out that
the "practice of opening sessions with prayer has continued
without interruption ever since that early session of Congress" and
has "been followed consistently in most of the states." Id. at 788-
89.

"This unique history" led the Court to "accept the interpretation of
the First Amendment draftsmen who saw no real threat to the
Establishment Clause arising from a practice of prayer similar to
that now challenged." Id. at 791.  Thus, the Court concluded that
"[t]o invoke Divine guidance on a public body entrusted with
making the laws is not, *in these circumstances,* an 'establishment'
of religion." Id. at 792 (emphasis added).  The Marsh Court
emphasized, however, that the legislative prayer at issue there did
not attempt "to proselytize or advance any one, or to disparage any
other, faith or belief." Id. at 794-95.

Wynne, 376 F.3d at 297.

The Wynne decision went on to explain that six years later, in Allegheny, the Court

provided further guidance on Marsh by explaining that "not even the 'unique history' of

legislative prayer can justify contemporary legislative prayers that have the effect of affiliating

the government with any one specific faith or belief." Id. (quoting Allegheny, 492 U.S. at 603).

As the Fourth Circuit explained, "[t]he [Allegheny] Court further stressed that while Marsh may

have found that history can 'affect the constitutionality of *nonsectarian* references to religion by

the government,' the Court had never held that 'history can[ ] legitimate practices that

demonstrate the government's allegiance to a particular sect or creed.'" Id. (quoting Allegheny,

492 U.S. at 603 (emphasis added by Fourth Circuit)).  As the Fourth Circuit in Wynne

recognized, the Allegheny Court concluded that:

> Marsh plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today . . . .  The history of this Nation, it is perhaps sad to say, contains numerous examples of official acts that endorsed Christianity specifically.  Some of these examples date back to the Founding of the Republic, but this heritage of official discrimination against nonChristians has no place in the jurisprudence of the Establishment Clause.  Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that *government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)*.  The clearest command of the Establishment Clause is that *one religious denomination cannot be officially preferred over another*.  There have been breaches of this command throughout this Nation's history, but they cannot diminish in any way the force of the command.

Id. at 297 (quoting Allegheny, 492 U.S. at 603-05 (emphasis added by Fourth Circuit) (internal quotations and citations omitted)).

The Fourth Circuit in Wynne concluded its summary of Marsh and Allegheny as follows:

> Thus, Marsh and Allegheny teach that, in view of our Nation's long and "unique history," a legislative body generally may, without violating the Establishment Clause, invoke Divine guidance for itself before engaging in its public business.  But Marsh and Allegheny also teach that a legislative body cannot, consistent with the Establishment Clause, "exploit" this prayer opportunity to "affiliate" the Government with one specific faith or belief in preference to others.

Id. at 298.

Applying those precedents to the opening prayers of the Great Falls Town Council that, as here, routinely invoked the name of Jesus Christ, the Fourth Circuit held in Wynne that the Town Council's practice of Christian prayer crossed the constitutional line established in Marsh and Allegheny:

> The prayers challenged here stand in sharp contrast to the prayer held not to constitute an "'establishment' of religion" in Marsh.  In Marsh, the approved prayer was characterized as "nonsectarian"

26

and "civil"; indeed, the chaplain had affirmatively "removed all references to Christ." Marsh, 463 U.S. at 793 n.14. Here, on the other hand, the prayers sponsored by the Town Council "frequently" contained references to "Jesus Christ," and thus promoted one religion over all others, dividing the Town's citizens along denominational lines.

* * * *

In sum, we must reject the Town Council's arguments that Marsh renders the challenged prayers constitutional. Marsh does not permit legislators to do what the district court, after a full trial, found the Town Council of Great Falls did here–that is, to engage, as part of public business and for the citizenry as a whole, in prayers that contain explicit references to a deity in whose divinity only those of one faith believe. The invocations at issue here, which specifically call upon Jesus Christ, are simply not constitutionally acceptable legislative prayer like that approved in Marsh. Rather, they embody the precise kind of "advance[ment]" of one particular religion that Marsh cautioned against. Accordingly, we hold the district court did not err in finding that the challenged prayers violated the Establishment Clause and enjoining the Town Council "from invoking the name of a specific deity associated with any one specific faith or belief in prayers given at Town Council meetings."

Id. at 298-99, 301-302. This case is factually and legally indistinguishable from Wynne, which,

as controlling precedent, requires the court to deny the Board's motion to dismiss.

The Fourth Circuit's 2011 Joyner decision reaffirms this conclusion. In Joyner, plaintiffs

sued the Forsyth County Board of Commissioners, challenging the practice of opening its

meetings with sectarian invocations delivered by local religious leaders. The invocation at the

December 17, 2007 Board meeting attended by plaintiffs, like almost every previous invocation,

invoked the name of Jesus. The December 17, 2007 prayer also made a number of other

references to specific tenets of Christianity.

Joyner thus differed from Wynne in that the invocations were given by religious leaders

from the community, as opposed to the Board members themselves. The Fourth Circuit did not

find this distinction to be dispositive, holding that "[i]t was the governmental setting for the

27

delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave

the invocation." 653 F.3d at 350.

    As was the case in <u>Wynne</u>, and here, after the constitutional challenge to the sectarian

prayer practice was raised, the Forsyth County Board decided to formalize its legislative prayer

policy:

> Under the written policy, the invocation would no longer be "listed or recognized as an agenda item for the meeting so that it may be clear the prayer is not considered a part of the public business." The policy also stated that nobody "shall be required to participate in any prayer that is offered," and that "[n]either the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker." Finally, the Board clarified that the prayers were "not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination." Instead, the stated goal of the policy was to "acknowledge and express the Board's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Forysth County."

<u>Id.</u> at 344.

    To be sure, the written policy adopted by the Forsyth County Board, like that adopted in

<u>Wynne</u> and at issue here, is facially neutral. <u>Id.</u> at 353. Despite adoption of this policy,

however, the prayers at the Forsyth County Board meetings "repeatedly continued to reference

specific tenets of Christianity." <u>Id.</u> "These were not isolated occurrences [as] . . . almost four-

fifths of the prayers referred to 'Jesus,' 'Jesus Christ,' 'Christ,' or 'Savior.'" <u>Id.</u> The <u>Joyner</u>

court declined to "turn a blind eye to the practical effects of the invocations at issue," and

concluded that references to Christian beliefs in sectarian invocations given at "meeting after

meeting . . . advanced Christianity and . . . made at least two citizens feel uncomfortable,

unwelcome, and unwilling to participate in the public affairs of Forsyth County." <u>Id.</u> at 354. As

such, the Fourth Circuit held that the legislative prayer of the Forsyth County Board violated the

28

Establishment Clause because it "'engage[d], as part of public business and for the citizenry as a whole, in prayers that contain[ed] explicit references to a deity in whose divinity only those of one faith believe.'" Id. at 349 (quoting Wynne, 376 F.3d at 301). The court explained:

> To be sure, citizens in a robust democracy should expect to hear all manner of things that they do not like. But the First Amendment teaches that religious faith stands on a different footing from other forms of speech and observance. Because religious belief is so intimate and so central to our being, government advancement and effective endorsement of one faith carries a particular sting for citizens who hold devoutly to another. This is precisely the opposite of what legislative invocations should bring about. In other words, whatever the Board's intentions, its policy, as implemented, has led to exactly the kind of "divisiveness the Establishment Clause seeks rightly to avoid."

Id. at 354-55 (quoting Simpson, 404 F.3d at 284).

The Fourth Circuit distinguished the sectarian invocations in Wynne and Joyner from the circumstances in Simpson, where the invocations preceding meetings of the Chesterfield County Board of Supervisors were nonsectarian in both policy and practice. The written prayer policy in Simpson mandated nonsectarian prayer, and the Fourth Circuit "upheld the policy precisely because the prayers were nondenominational." Joyner, 653 F.3d at 348. Unlike the governmental bodies in Wynne and Joyner, the Chesterfield County Board of Supervisors had "aspired to non-sectarianism and requested that invocations refrain from using Christ's name, or, for that matter, any denominational appeal." Simpson, 404 F.3d at 284. In stark contrast to the practices of the Great Falls Town Council in Wynne, the Forsyth County Board in Joyner, or the Pittsylvania County Board here, the Chesterfield County Board practiced what its policy preached, resulting in "a wide variety of prayers" that "described divinity in wide and embracive

terms," displaying "ecumenism . . . consonant with our character both as a nation of faith and as

a country of free religious exercise and broad religious tolerance." Id.[9]

The Fourth Circuit in Joyner sets out "clear boundaries" for legislative prayer:

> [L]egislative prayer must strive to be nondenominational so long
> as that is reasonably possible–it should send a signal of welcome
> rather than exclusion. It should not reject the tenets of other faiths
> in favor of just one. Infrequent references to specific deities,
> standing alone, do not suffice to make out a constitutional case.
> But legislative prayers that go further–prayers in a particular venue
> that repeatedly suggest the government has put its weight behind a
> particular faith–transgress the boundaries of the Establishment
> Clause. Faith is as deeply important as it is deeply personal, and
> the government should not appear to suggest that some faiths have
> it wrong and others got it right.

653 F.3d at 349.

The Board argues that the passage of a resolution on September 6, 2011 providing that

the prayer to be delivered by the designated Board member should not "proselytize or advance

any faith, or disparage the religious faith or non-religious views of others," Verified Compl.,

Dkt. # 1, at Ex. A ¶ 6, allows it to continue its Christian prayers. The Fourth Circuit's decisions

in Wynne and Joyner hold to the contrary. Resolutions very similar to the Board's September 6,

2011 resolution were adopted by the local governing bodies in both Wynne and Joyner, and the

Fourth Circuit held in each case that the resolutions alone did not exonerate the constitutional

---

[9] The 2008 holding of the Fourth Circuit in Turner is consistent. In Turner, an ordained minister and member of the City Council of Fredericksburg, Virginia sought to include a reference to Jesus Christ in his prayer opening City Council meetings, contrary to Council policy of opening its meetings with nonsectarian prayer. Retired Supreme Court Justice Sandra Day O'Connor, writing for the Fourth Circuit panel, concluded as follows:

> The Council's decision to provide only nonsectarian legislative prayers
> places it squarely within the range of conduct permitted by Marsh and Simpson.
> The restriction that prayers be nonsectarian in nature is designed to make the
> prayers accessible to people who come from a variety of backgrounds, not to
> exclude or disparage a particular faith. The Council's decision to open its
> legislative meetings with nondenominational prayers does not violate the
> Establishment Clause.

534 F.3d at 356.

violation.  Indeed, while the text of the resolutions espouses neutrality, the actual practices of the governing bodies in Wynne and Joyner remained largely sectarian.  Plaintiff in this case has alleged that regardless of the language of the resolution, Board members have "stated their intention to continue praying in the name of Jesus Christ, and have, indeed, continued that practice."  Verified Compl., Dkt. # 1, at ¶ 16.  As in Wynne and Joyner, the mere passage of a resolution providing that the prayers used at the opening of a government meeting should not proselytize or advance any faith cannot immunize the body from constitutional challenge where its actual practice fails to meet the standard set forth in its resolution.

Plaintiff's allegations in the verified complaint state a plausible claim that the Board's sectarian prayer practice violates the Establishment Clause.  As in Wynne and Joyner, plaintiff alleges that the Board regularly opens its meetings with invocations making explicit reference to "Jesus Christ," "Jesus," or "Christ" and that this practice has continued despite the adoption of a neutral prayer resolution.  As such, plaintiff has plausibly alleged that the Board has run afoul of the "clear boundaries" articulated in Joyner.

### IV.

Finally, the Board cannot seek to justify its sectarian prayer practice by invoking notions of democracy, arguing that nothing prevents a non-Christian from being elected to the Board and publicly expressing his or her beliefs at Board meetings.  Such a rationalization disregards the fundamental purpose of the Bill of Rights.  The Bill of Rights exists to protect the rights of individuals from popular tyranny.  While the members of the Board of Supervisors of Pittsylvania County are subject to popular election, the right of the citizens of Pittsylvania County to be free from government-sponsored religion is not.  In short, the fundamental right of

a citizen of Pittsylvania County to be free from sectarian prayer at government meetings is not

dependent upon the faith of those elected by the majority to its Board of Supervisors.

> Whatever else the Establishment Clause may mean . . . , it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). There have been breaches of this command throughout this Nation's history, but they cannot diminish in any way the force of the command.

Allegheny, 492 U.S. at 605.

As it is abundantly clear that the Board's practice of regularly opening its meetings with

Christian prayer runs afoul of just that command, its motion to dismiss must be **DENIED**.

Entered:  February 3, 2012

/s/ Michael F. Urbanski
Michael F. Urbanski
United States District Judge

32