**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION**

| | | |
|---|---|---|
| **BARBARA HUDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 4:11cv00043** |
| **v.** | ) | |
| | ) | |
| **PITTSYLVANIA COUNTY, VIRGINIA and** | ) | |
| **BOARD OF SUPERVISORS OF** | ) | **By:  Michael F. Urbanski** |
| **PITTSYLVANIA COUNTY, VIRGINIA,** | ) | **United States District Judge** |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION**</u>

        This matter is before the court on cross motions for summary judgment filed by plaintiff

Barbara Hudson (Dkt. # 57), and defendants Board of Supervisors of Pittsylvania County and

Pittsylvania County, Virginia (Dkt. # 59).[1]  Hudson argues that the Board's consistent practice of

opening its meetings with sectarian prayers led by Board members violates the First Amendment

of the United States Constitution, and she seeks a permanent injunction prohibiting the Board

from continuing to engage in that practice.  The Board's principal contention is that Hudson

lacks standing to bring an Establishment Clause challenge to the Board's prayer practice.  The

court exhaustively addressed the Board's standing argument at the motion to dismiss stage, <u>Doe</u>

<u>v. Pittsylvania County</u>, 842 F. Supp. 2d 906 (W.D. Va. 2012), and nothing revealed in discovery

changes the conclusion reached there that Hudson has standing to assert this claim.  In its

summary judgment brief, the Board again asks the court to conclude that the Board's practice of

regularly opening its meetings with sectarian prayers led by Board members does not violate the

---

[1] Defendant Board of Supervisors of Pittsylvania County is the governing body of defendant Pittsylvania County,
Virginia.  Defendants are hereinafter collectively referred to as "the Board."

Establishment Clause.  As was explained in great detail in the court's memorandum opinion

denying the Board's motion to dismiss, the Board advocates a view of the law inconsistent with

controlling United States Supreme Court and Fourth Circuit Court of Appeals precedent.  As

such, the Board's motion for summary judgment must be **DENIED,** Hudson's motion for

summary judgment **GRANTED**, and a Permanent Injunction Order entered. [2]

## I.

Although this case is now before the court on a motion for summary judgment[3] as

opposed to a motion to dismiss, nothing of substance has changed since the court determined that

Hudson had standing to bring her Establishment Clause claim at the motion to dismiss stage.

The facts are undisputed that prior to the entry of the preliminary injunction on February 3, 2012,

the Board consistently opened each of its meetings with a prayer from a Board member making a

specific reference to the Christian faith.[4]  It is likewise undisputed that Hudson regularly

attended Board meetings.  Hudson, a non-Christian, has averred and testified under oath that she

---

[2] As section III of this memorandum opinion explains, the court will not address the issue raised in Hudson's summary judgment motion that the actions of Board members in bowing their heads or saying "Amen" following prayers offered by the members of the public during the "Hearing of the Citizens" public comment portion of Board meetings violates the Establishment Clause as those claims were neither alleged in the complaint nor brought before the court by means of an amended complaint.

[3] Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995).  When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties.  Celotex, 477 U.S. at 322.  Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237.  If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient."  Nguyen, 44 F.3d at 237 (quoting Straw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)).

[4] For example, the Board's opening prayer on August 17, 2010 was as follows:  "Gracious heavenly father, we thank you for the opportunity to address you, and thank you O Lord, because you made all of this possible.  You are our God, you are our King, you are the reason we are here.  God, without you, and Jesus, without you, there would be no life on earth, and we would not be able to sit down and express our Christian values before the good people of Pittsylvania County.  Amen."

was offended and made to feel an outsider by the repeated invocation of the Christian faith by the Board members.  The court has reviewed all of the exhibits filed with the summary judgment briefs, including the complete transcript of Hudson's deposition and her interrogatory answers, and believes, consistent with the memorandum opinion entered on February 3, 2012, that Hudson has standing to complain about sectarian prayers offered in her presence by members of the Board at public meetings.

The fact that Hudson has been an outspoken critic of the Board and has opposed positions taken by the Board both inside and outside of court does not change two facts critical to the standing inquiry in this circuit:  (1) prior to the preliminary injunction, members of the Board regularly opened its public meetings with sectarian prayers; and (2) Hudson, witnessing these prayers, was offended by them and made to feel an outsider in her community.  As addressed at length in the memorandum opinion on the motion to dismiss, Doe v. Pittsylvania County, 842 F. Supp. 2d at 911-915, the Fourth Circuit Court of Appeals in Suhre v. Haywood County, 131 F.3d 1083 (4th Cir. 1997), has held such facts to be sufficient to confer standing.

Suhre involved a display of the Ten Commandments in the main courtroom of the Haywood County, North Carolina courthouse.  Plaintiff Richard Suhre, a "contentious character in Haywood County," 131 F.3d at 1085, was exposed to the courtroom display as a party to two court proceedings and four other public meetings held in the courtroom.  Rejecting Haywood County's standing challenge, the Fourth Circuit recognized that "[t]he injury that gives standing to plaintiffs in these cases is that caused by unwelcome direct contact with a religious display that appears to be endorsed by the state.  Such personal contact with state-sponsored religious symbolism is precisely the injury that was sufficient to confer standing in School District of Abington v. Schempp, 374 U.S. 203 (1963)."  Suhre, 131 F.3d at 1086.

In Schempp, school children and their parents sued the school district, complaining of the school's practice of reading Bible verses and reciting The Lord's Prayer each morning before classes began.  The Supreme Court had little difficulty finding that the students and their parents had standing to challenge the practice of school prayer:

> The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed.  These interests surely suffice to give the parties standing to complain.

374 U.S. at 224 n.9.  As the Fourth Circuit noted in Suhre, "Schempp thus recognized 'a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause' to those persons directly affected by alleged violations of the First Amendment."  131 F.3d at 1086 (citing Ass'n of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 154 (1970)).

Just as the plaintiffs in Schempp and Suhre, Hudson has had direct personal contact with the sectarian prayer practices of the Board.  Hearing with her own ears the Christian prayers offered by Board members as part of a formal governmental meeting, Hudson's contact is neither casual nor remote.  It is direct injury, and, as such, Hudson has standing to pursue an Establishment Clause claim concerning the Christian prayers she repeatedly heard.

In her interrogatory answers, Hudson outlined her injury as follows:

> Plaintiff's injury consists in unwelcome and direct contact with sectarian prayers delivered or endorsed by the Board of Supervisors.  Such prayers convey to plaintiff and other non-Christian citizens the message that they are not welcome at Board meetings.  These prayers create a perception that the Board is unlikely to treat non-Christians fairly because they do not follow the Board's preferred faith. Such prayers make plaintiff feel like an outsider in her own community.

Hudson's Answers to Interrogatories (Dkt. # 60-6), at 4.  Likewise, in her deposition, Hudson

testified that, as a non-Christian, she objected to the exclusively Christian prayer and was

frightened by it.  Hudson Deposition (Dkt. # 60-3), at 81-82.  Hudson explained:

> When sectarian prayer is being given in the name of Christianity, that has become – in the Board of Supervisor's Meeting, that has become the official religion of your governing body, and that scares me.
>
> * * * *
>
> It's saying to me, if I convert to Christianity I will be a part of this group – this government.  I will have equal footing.
>
> * * * *
>
> I think it's frightening to have government advance their religion over everybody else.

Id.  Hudson also testified that the sectarian prayers of the Board members made her feel

"like an outsider" or "lesser citizen."  Id. at 212, 220.

In her Declaration filed in this case, Hudson averred consistently:

> 4.  Until February 3, 2012, when this Court issued its preliminary injunction in this case, the Board opened all of its meetings with a prayer delivered by a member of the Board of Supervisors.
>
> 5.  The opening invocation at nearly every meeting was explicitly Christian in nature; that is, it invoked the name of "Jesus Christ" "Jesus" or "Christ."
>
> 6.  The audience was asked to stand while the prayer was delivered.  The supervisors and the audience bowed their heads during the prayer.
>
> 7.  The Board's practice of opening meetings with a sectarian prayer distressed me because I do not subscribe to the particular faith promoted by the Board's opening prayers.  The Christian prayers conveyed to me and other non-Christians the message that we are not welcome at Board meetings.  The prayers made me feel like an outsider in my own community.
>
> 8.  Although the sectarian prayers greatly upset me for years, I did not complain about them to the Board or the County until the

> Fourth Circuit issued its opinion in <u>Joyner v. Forsyth County</u>, 653
> F.3d 341 (4th Cir. 2011).  Having had numerous relatives die in the
> Holocaust during my lifetime, and having myself been beaten up
> for being Jewish when I was a child, I was very wary of taking any
> action that would make me stand out for my religious beliefs, or
> that could be perceived as challenging the majority religion.

Hudson Decl. (Dkt. # 58-1), at ¶¶ 5-8.

After listening to the Board's consistently Christian prayers for some years, Hudson first

objected to the practice by sending an email to the Pittsylvania County Attorney on August 11,

2011, after she learned of the Fourth Circuit's decision in <u>Joyner v. Forsyth County</u>, 653 F.3d

341 (4th Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 1097 (2012).  Hudson testified that the Board

responded to her objection by ramping up its Christian prayer.  Hudson testified:  "At the board

meeting on August 16th, instead of one sectarian prayer, every single member of the board got

up and did Christian prayers, knowing that it was me.  And I felt that I was being assaulted.

They were using prayer to assault." Hudson Deposition (Dkt. # 60-3), at 214.  She explained

further:

> The board, when they were praying one time, they were praying
> and establishing basically a religious board – a religious
> government.  When they got up to pray seven times, they had
> already received my letter in which I informed them that as a non-
> Christian, making a sectarian prayer makes me uncomfortable.
>
>             * * * *
>
> It was seven prayers that made me seven times more
> uncomfortable than one prayer.

<u>Id.</u> at 218-19.

The Board takes issue with Hudson's assertion of injury, contending that her history of

antagonism towards the Board suggests that her opposition to the Board's sectarian prayer

practice is simply part of a broader pattern of vexatious litigation against the Board.  The Board

cites lawsuits filed against it by Hudson on behalf of various clients[5] and editorials penned by Hudson expressing criticism and hostility towards the Board.  As was the case with Richard Suhre, Hudson appears to be a "contentious character" in Pittsylvania County.  Suhre, 131 F.3d at 1085.  However, Hudson's historic role as a Board antagonist is beside the point.  The fact that Hudson has clashed with the Board in the past cannot absolve the Board of its clear violation of the Establishment Clause or change the fact that Hudson personally experienced the Board's practice of opening each meeting with a Christian prayer that was offensive to her.

The Board disputes that Hudson was genuinely offended by its Christian prayer practice, arguing that she put up with it for years without complaint, took no action in response to its prayers and only raised the issue in an email to the County Attorney once the Fourth Circuit decided Joyner.[6]  In this regard, Hudson testified, "[t]he fact that they give prayers was upsetting to me, but that didn't stop me from going to the meetings."  Hudson Deposition (Dkt. # 60-3), at 96.  To establish standing, Hudson need not demonstrate that she avoided the government's religious practice or changed her behavior as a result of it.  All she need prove is that she has had "direct unwelcome contact" with the offending practice.  Suhre, 131 F.3d at 1088.  In Suhre, the Fourth Circuit put to rest the argument that an Establishment Clause plaintiff must demonstrate that the conduct was so offensive that she must have taken action to avoid it or otherwise changed her behavior.  The court reasoned:

> Absent Supreme Court direction, we are unwilling to craft a rule of
> standing for religious display cases that would effectively add

---

[5] Hudson, a lawyer, has filed suit against the County in the past over various Board decisions.

[6] Joyner was decided on July 29, 2011. The Board argues that Hudson's August 11, 2011 email to the Pittsylvania County Attorney complaining about the Board's Christian prayer practice was not motivated by the Joyner decision, but rather by revenge.  The Board contends that Hudson had just been denied an appeal of a suit she lost against Pittsylvania County, in which she and her clients were assessed fees and sanctions.  The Board claims that the email she sent to the County Attorney over the Board's prayer practice was in retaliation for her loss in this unrelated case, rather than a good faith concern over the Board's prayer practice.  The Board's argument is entirely conjectural. Hudson avers that she did not learn of the decision on her appeal until August 13, 2011, two days after she sent the email referencing Joyner.  The Board has offered no evidence creating a genuine issue of material fact on this point.

"insult" to the existing "injury" requirement.  Compelling plaintiffs to avoid public schools or buildings is to impose on them a burden that no citizen should have to shoulder.  A public school or county courthouse exists to serve *all* citizens of a community, whatever their faith may be.  Rules of standing that require plaintiffs to avoid public places would make religious minorities into outcasts.  Forcing an Establishment Clause plaintiff to avoid the display of which he complains in order to gain standing to challenge it only imposes an extra penalty on individuals already alleged to be suffering a violation of their constitutional rights.  We do not think Article III requires as much.

131 F.3d at 1088 (emphasis in original).  The Fourth Circuit concluded as follows:  "The cognizable injury caused by personal contact with a public religious display may thus satisfy the injury-in-fact requirement for standing to bring an Establishment Clause case.  The plaintiff need not meet any additional change-in-behavior or avoidance requirement."  Id. at 1090.  Although Suhre was a public display case, the standing calculus is no different here.  Hudson's personal contact with the Board's Christian prayer practice is sufficient to meet the standing requirement in this case.

As it did at the motion to dismiss stage, the Board argues that Hudson's issue with the Board's opening prayers does not rise above the generalized grievance level, and, as such, she lacks standing to assert an Establishment Clause claim.  The memorandum opinion denying the Board's motion to dismiss addressed the cases cited by the Board, including Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464 (1982), finding these precedents distinguishable as they did not involve the kind of personal contact with the Board's sectarian prayer practice involved in this case. [7]  Doe v. Pittsylvania

---

[7] At summary judgment, the Board cites a few additional cases, none of which change the conclusion that Hudson has standing.  Indeed, most of the new cases cited by the Board reflect broad standing principles, each of which Hudson readily meets.  For example, the Board cites Warth v. Seldin, 422 U.S. 490, 503 (1975), a case concerning zoning practices in Rochester, New York, for the proposition that a plaintiff must have a personal stake in the outcome.  In Warth, none of the plaintiffs could establish that they were affected by the zoning ordinance.  In contrast, Hudson's repeated, personal exposure to the Board's consistently Christian prayers and the offense she took from them establishes her personal stake.  Friends of the Earth v. Laidlaw Environmental Services, Inc., 528

8

County, 842 F. Supp. 2d 906, 912 n.3 (W.D. Va. 2012).  The Fourth Circuit's decision in Suhre also forecloses the Board's generalized grievance argument:

> [D]irect contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen's general grievance against unconstitutional government conduct.  Plaintiffs were denied standing in Valley Forge because they had absolutely no personal contact with the alleged establishment of religion.

Suhre, 131 F.3d at 1086.  This is not a case, as in Valley Forge, where the plaintiff's stake was a "mere abstract objection to unconstitutional conduct."  131 F.3d at 1086.  Rather, it is plain that plaintiff, having personally heard the consistently Christian prayers of the Board at its meetings, has sustained direct injury sufficient to confer standing to bring an Establishment Clause challenge.

In footnote 1 of its reply brief (Dkt. # 65), the Board categorizes a 2011 decision by a district court in Texas as being a "similar situation."  The court does not find the circumstances of that case, Freedom From Religion Foundation, Inc. v. Perry, No. H-11-2585, 2011 WL 3269339 (S.D. Tex. July 28, 2011), or those presented in the Seventh Circuit's opinion on which it relied, Freedom From Religion Foundation, Inc. v. Obama, 641 F.3d 803, 806 (7th Cir. 2011), to be sufficiently similar to warrant their application to this case.  Each of these cases involved a declaration by an executive, the Governor of Texas and the President of the United States,

---

U.S. 167, 180-81 (2000), a suit by environmental groups for various permit violations, is cited by the Board for the plain vanilla proposition that injury must be concrete, particularized, actual and imminent, as opposed to conjectural or hypothetical.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (same).  As the Fourth Circuit noted in Suhre, had Hudson lived somewhere outside of Pittsylvania County and not personally experienced the Board's repeatedly Christian prayers, her injury would have been of the abstract, generalized grievance variety.  Such is not the case with the direct contact both Suhre and Hudson experienced.  The landmark case of Baker  v. Carr, 369 U.S. 186, 204-08 (1962), affords no assistance to the Board.  There, the Supreme Court recognized that voters had standing to challenge a Tennessee statute which debased their vote.  Flast v. Cohen, 392 U.S. 83 (1986), involved taxpayer standing, again of no application here.  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), is likewise not on point.  That case concerned a suit by an environmental group against a steel manufacturer for failing to make a report required by a federal statute.  Rather than concern the injury requirement of standing at issue in this case, Steel Co. concerned the third element of standing, redressability, i.e., the likelihood that the requested relief will redress the alleged injury.  As the injunction in this case clearly redresses the regular sectarian prayer practice complained of by Hudson, the redressability requirement is plainly met.

respectively, calling for a day of prayer.  In these cases, the court considered the executives'

statements to be mere requests or invitations to pray, "and no injury flows from a mere request."

<u>Perry</u>, 2011 WL 3269339, at \*4.  In <u>Freedom From Religion Foundation v. Obama</u>, the sentence

at issue in the statement issued by the President was:  "I call upon the citizens of our Nation to

pray, *or otherwise give thanks, in accordance with their own faiths and consciences*, for our

many freedoms and blessings, and I invite all people of faith to join me in asking for God's

continued guidance, grace, and protection as we meet the challenges before us."  641 F.3d at 807

(emphasis in original). The Seventh Circuit reasoned:  "[L]et us suppose that plaintiffs

nonetheless feel slighted.  Still, hurt feelings differ from legal injury.  The 'value interests of

concerned bystanders' do not support standing to sue."  <u>Id.</u> (internal citation omitted).

These cases differ in two material respects from the case presented here.  First, the

invitations to pray issued by Governor Perry and President Obama are fundamentally different

from the consistent practice of offering sectarian prayers as part of the official meetings of the

governing body of Pittsylvania County.  Second, Hudson is not merely a bystander to the

request.  Over and over again, she was directly and personally exposed to sectarian prayers

offered as part of the official proceedings of the Pittsylvania County Board of Supervisors.

Last year, in Delaware, a district court was asked to consider a case far closer to the facts

of this case than these two invitation to pray cases.  In <u>Mullin v. Sussex County</u>, 861 F. Supp. 2d

411 (D. Del. 2012), the court found that the practice of Sussex County Council of opening its

meetings with a recitation of The Lord's Prayer violated the Establishment Clause and

preliminarily enjoined this practice.  The court concluded that plaintiffs adequately alleged

standing as a result of their direct and unwelcome exposure to the Sussex County Council's

prayer practice.  In so doing, the court addressed both <u>Valley Forge</u> and <u>Freedom From Religion</u>

Foundation v. Obama, noting that in each case "the plaintiffs had no direct contact with the challenged conduct but, instead, merely heard of the conduct from others. . . .  Conversely, here, the Complaint alleges that all of the Plaintiffs attended the Council meetings and directly heard and were exposed to the recitation of The Lord's Prayer."  Id. at 420 n.4.  The opinion of the federal district court in Mullin, issued after this court denied the Board's motion to dismiss and entered the preliminary injunction in the instant case, squarely supports this court's decision.  As the Mullin court concluded:

> First, Plaintiffs assert their own legal rights and interests.  Second, Plaintiffs' injuries of being directly exposed to the Council's allegedly unconstitutional recitation of The Lord's Prayer are not generalized grievances that would be more appropriately addressed in the representative branches.  Finally, Plaintiffs' allegations that the Council violated the Establishment Clause by endorsing one religion – Christianity, and specifically Protestant Christianity – over all other religions is at least one of the exact interests protected by the Establishment Clause.

Id. at 419.

In sum, nothing raised in the Board's briefs or argument suggests that the court should stray from the controlling precedent in this circuit, the Suhre decision, compelling the conclusion that Hudson has standing to assert an Establishment Clause claim.

## II.

Hudson argues on summary judgment that the Board's practice of opening its meetings with Christian prayers violates the Establishment Clause.  Disagreeing with the clear holdings of the Fourth Circuit on the unconstitutionality of sectarian legislative prayer, the Board argues that its practice of opening each meeting with Christian prayers is constitutional.  Bound by controlling Fourth Circuit and Supreme Court precedent, the court must reject the Board's argument.

11

In <u>Wynne v. Town of Great Falls</u>, 376 F.3d 292 (4th Cir. 2004), <u>cert. denied</u>, 545 U.S. 1152 (2005), and <u>Joyner</u>, 653 F.3d 341, the Fourth Circuit makes it very clear that a local government violates the Establishment Clause by opening its meetings with sectarian prayers. The Supreme Court denied certiorari review in each case.  Those decisions are the law of this circuit and binding precedent on this court.

**A.**

The facts in <u>Wynne</u> bear a strong resemblance to this case.  There, the Town Council of Great Falls, South Carolina opened its meetings with a prayer led by a member of the Council. <u>Wynne</u>, 376 F.3d at 294.  Each of the Council members was a Christian, and the opening or closing portion of the prayers frequently referred to "Jesus," "Jesus Christ," "Christ," or "Savior."  <u>Id.</u>  During the prayers, citizens attending the meetings customarily stood and bowed their heads, and town residents participated in the prayers by saying "Amen" at the end.  <u>Id.</u> Wynne, a follower of the Wiccan faith, objected to the Town Council's practice of referring to "Jesus Christ" in its prayers and requested that the prayers be limited to God and that members of different religions be invited to give prayers.  <u>Id.</u> at 294-95.  The Mayor responded at the meeting that the Council had always done it that way and was not going to change.  <u>Id.</u> at 295. Wynne testified that thereafter she became very uncomfortable, and claimed to be ostracized and treated differently by the Council.  <u>Id.</u> at 295-96.  Her Establishment Clause suit followed.  <u>Id.</u> at 296.  After suit was filed, but before trial, the Town Council adopted a resolution providing, <u>inter alia</u>, that "[t]he invocation shall not contain or address any specific beliefs . . . of any specific religion."  <u>Id.</u> at 296 n.2.  Regardless, after adoption of the resolution, the Mayor announced that he would not prohibit any Council member from making a specific reference to "Jesus," "Jesus Christ," or "Christ."  <u>Id.</u>  As the resolution did not discontinue the practice of Christian prayer

12

challenged by Wynne, the district court concluded that the resolution did not moot Wynne's

request for injunctive relief, and the Fourth Circuit agreed.

In Wynne, the Fourth Circuit discussed in detail the Supreme Court's legislative prayer

decision in Marsh v. Chambers, 463 U.S. 783 (1983), and the further guidance on the proper

scope of the Marsh decision provided by the Supreme Court in County of Allegheny v. ACLU

Greater Pittsburgh Chapter, 492 U.S. 573 (1989).  The Fourth Circuit summarized the holding in

Marsh as follows:

> In Marsh, the Court upheld the Nebraska legislature's practice of
> opening each session with a nonsectarian prayer led by a chaplain
> paid with public funds.  The Court based this holding on an
> extensive historical inquiry, concluding that since members of the
> First Congress had authorized the appointment of paid chaplains
> only three days before agreeing to the language of the
> Establishment Clause, they could not have intended the
> Establishment Clause "to forbid what they had just declared
> acceptable."  [463 U.S.] at 786-90.  The Marsh Court also pointed
> out that the "practice of opening sessions with prayer has
> continued without interruption ever since that early session of
> Congress" and has "been followed consistently in most of the
> states."  Id. at 788-89.
>
> "This unique history" led the Court to "accept the interpretation of
> the First Amendment draftsmen who saw no real threat to the
> Establishment Clause arising from a practice of prayer similar to
> that now challenged."  Id. at 791.  Thus, the Court concluded that
> "[t]o invoke Divine guidance on a public body entrusted with
> making the laws is not, *in these circumstances*, an 'establishment'
> of religion."  Id. at 792 (emphasis added).  The Marsh Court
> emphasized, however, that the legislative prayer at issue there did
> not attempt "to proselytize or advance any one, or to disparage any
> other, faith or belief."  Id. at 794-95.

Wynne, 376 F.3d at 297.

The Wynne decision went on to explain that six years later, in Allegheny, the Court

provided further guidance on Marsh by explaining that "not even the 'unique history' of

legislative prayer can justify contemporary legislative prayers that have the effect of affiliating

13

the government with any one specific faith or belief." Wynne, 376 F.3d at 297 (quoting

Allegheny, 492 U.S. at 603). As the Fourth Circuit explained, "[t]he [Allegheny] Court further

stressed that while Marsh may have found that history can 'affect the constitutionality of

*nonsectarian* references to religion by the government,' the Court had never held that 'history

can[ ] legitimate practices that demonstrate the government's allegiance to a particular sect or

creed.'" Id. (quoting Allegheny, 492 U.S. at 603 (emphasis added by Fourth Circuit)). As the

Fourth Circuit in Wynne recognized, the Allegheny Court concluded that:

> Marsh plainly does not stand for the sweeping proposition . . . that
> all accepted practices 200 years old and their equivalents are
> constitutional today . . . . The history of this Nation, it is perhaps
> sad to say, contains numerous examples of official acts that
> endorsed Christianity specifically. Some of these examples date
> back to the Founding of the Republic, but this heritage of official
> discrimination against nonChristians has no place in the
> jurisprudence of the Establishment Clause. Whatever else the
> Establishment Clause may mean (and we have held it to mean no
> official preference even for religion over nonreligion), it certainly
> means at the very least that *government may not demonstrate a*
> *preference for one particular sect or creed (including a preference*
> *for Christianity over other religions).* The clearest command of
> the Establishment Clause is that *one religious denomination cannot*
> *be officially preferred over another.* There have been breaches of
> this command throughout this Nation's history, but they cannot
> diminish in any way the force of the command.

Id. (quoting Allegheny, 492 U.S. at 603-05 (emphasis added by Fourth Circuit) (internal

quotations and citations omitted)).

The Fourth Circuit in Wynne concluded its summary of Marsh and Allegheny as follows:

> Thus, Marsh and Allegheny teach that, in view of our Nation's
> long and "unique history," a legislative body generally may,
> without violating the Establishment Clause, invoke Divine
> guidance for itself before engaging in its public business. But
> Marsh and Allegheny also teach that a legislative body cannot,
> consistent with the Establishment Clause, "exploit" this prayer
> opportunity to "affiliate" the Government with one specific faith or
> belief in preference to others.

14

376 F.3d at 298.

Applying those precedents to the opening prayers of the Great Falls Town Council that, as here, routinely invoked the name of Jesus Christ, the Fourth Circuit held in Wynne that the Town Council's practice of Christian prayer crossed the constitutional line established in Marsh and Allegheny:

> The prayers challenged here stand in sharp contrast to the prayer held not to constitute an "'establishment' of religion" in Marsh. In Marsh, the approved prayer was characterized as "nonsectarian" and "civil"; indeed, the chaplain had affirmatively "removed all references to Christ." Marsh, 463 U.S. at 793 n.14. Here, on the other hand, the prayers sponsored by the Town Council "frequently" contained references to "Jesus Christ," and thus promoted one religion over all others, dividing the Town's citizens along denominational lines.
>
> *  *  *  *
>
> In sum, we must reject the Town Council's arguments that Marsh renders the challenged prayers constitutional. Marsh does not permit legislators to do what the district court, after a full trial, found the Town Council of Great Falls did here – that is, to engage, as part of public business and for the citizenry as a whole, in prayers that contain explicit references to a deity in whose divinity only those of one faith believe. The invocations at issue here, which specifically call upon Jesus Christ, are simply not constitutionally acceptable legislative prayer like that approved in Marsh. Rather, they embody the precise kind of "advance[ment]" of one particular religion that Marsh cautioned against. Accordingly, we hold the district court did not err in finding that the challenged prayers violated the Establishment Clause and enjoining the Town Council "from invoking the name of a specific deity associated with any one specific faith or belief in prayers given at Town Council meetings."

Id. at 298-99, 301-302. This case is factually and legally indistinguishable from Wynne, which, as controlling precedent, requires the court to reject the Board's argument that its prayer practice passes constitutional muster.

## B.

The Fourth Circuit's 2011 <u>Joyner</u> decision reaffirms this conclusion.  In <u>Joyner</u>, plaintiffs sued the Forsyth County Board of Commissioners, challenging its practice of opening its meetings with sectarian invocations delivered by local religious leaders.  The invocation at the December 17, 2007 Forsyth County Board meeting attended by plaintiffs, like almost every previous invocation, invoked the name of Jesus.  The December 17, 2007 prayer also made a number of other references to specific tenets of Christianity.

<u>Joyner</u> thus differed from <u>Wynne</u> in that the invocations were given by religious leaders from the community, as opposed to the Board members themselves.  The Fourth Circuit did not find this distinction to be dispositive, holding that "[i]t was the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation."  653 F.3d at 350.

As was the case in <u>Wynne</u>, and here,[8] after the constitutional challenge to the sectarian prayer practice was raised, the Forsyth County Board decided to formalize its legislative prayer policy:

> Under the written policy, the invocation would no longer be "listed or recognized as an agenda item for the meeting so that it may be clear the prayer is not considered a part of the public business." The policy also stated that nobody "shall be required to participate in any prayer that is offered," and that "[n]either the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker."  Finally, the Board clarified that the prayers were "not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination."  Instead, the stated goal of the policy was to "acknowledge and express the Board's respect

---

[8] After Hudson complained about the Board's practice of opening its meetings with Christian prayers, the Board adopted a prayer policy mimicking the facially neutral policies adopted by the Town Council in <u>Wynne</u> and Board of Commissioners in <u>Joyner</u>.  <u>See</u> <u>Doe v. Pittsylvania County</u>, 842 F. Supp. 2d at 909-10.  Despite the adoption of this policy, it is undisputed that the Board continued to regularly open its meetings with Christian prayers.

> for the diversity of religious denominations and faiths represented
> and practiced among the citizens of Forsyth County."

Joyner, 653 F.3d at 344.

To be sure, the written policy adopted by the Forsyth County Board, like that adopted in Wynne and at issue here, is facially neutral.  Joyner, 653 F.3d at 353.  Despite adoption of this policy, however, the prayers at the Forsyth County Board meetings "repeatedly continued to reference specific tenets of Christianity."  Id.  "These were not isolated occurrences [as] . . . almost four-fifths of the prayers referred to 'Jesus,' 'Jesus Christ,' 'Christ,' or 'Savior.'"  Id. The Joyner court declined to "turn a blind eye to the practical effects of the invocations at issue," and concluded that references to Christian beliefs in sectarian invocations given at "meeting after meeting . . . advanced Christianity and . . . made at least two citizens feel uncomfortable, unwelcome, and unwilling to participate in the public affairs of Forsyth County."  Id. at 354.  As such, the Fourth Circuit held that the legislative prayer of the Forsyth County Board violated the Establishment Clause because it "'engage[d], as part of public business and for the citizenry as a whole, in prayers that contain[ed] explicit references to a deity in whose divinity only those of one faith believe.'"  Id. at 349 (quoting Wynne, 376 F.3d at 301).  The court explained:

> To be sure, citizens in a robust democracy should expect to hear all
> manner of things that they do not like.  But the First Amendment
> teaches that religious faith stands on a different footing from other
> forms of speech and observance.  Because religious belief is so
> intimate and so central to our being, government advancement and
> effective endorsement of one faith carries a particular sting for
> citizens who hold devoutly to another.  This is precisely the
> opposite of what legislative invocations should bring about.  In
> other words, whatever the Board's intentions, its policy, as
> implemented, has led to exactly the kind of "divisiveness the
> Establishment Clause seeks rightly to avoid."

Id. at 354-55 (quoting Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276, 284 (4th Cir.), cert. denied, 546 U.S. 937 (2005)).

The Fourth Circuit distinguished the sectarian invocations in <u>Wynne</u> and <u>Joyner</u> from the circumstances in <u>Simpson</u>, where the invocations preceding meetings of the Chesterfield County Board of Supervisors were nonsectarian in both policy and practice.  The written prayer policy in <u>Simpson</u> mandated nonsectarian prayer, and the Fourth Circuit "upheld the policy precisely because the prayers were nondenominational."  <u>Joyner</u>, 653 F.3d at 348.  Unlike the governmental bodies in <u>Wynne</u> and <u>Joyner</u>, the Chesterfield County Board of Supervisors had "aspired to non-sectarianism and requested that invocations refrain from using Christ's name, or, for that matter, any denominational appeal."  <u>Simpson</u>, 404 F.3d at 284.  In stark contrast to the practices of the Great Falls Town Council in <u>Wynne</u>, the Forsyth County Board in <u>Joyner</u>, and the Pittsylvania County Board here, the Chesterfield County Board practiced what its policy preached, resulting in "a wide variety of prayers" that "described divinity in wide and embracive terms," displaying "ecumenism . . . consonant with our character both as a nation of faith and as a country of free religious exercise and broad religious tolerance."  <u>Id.</u>[9]

The Fourth Circuit in <u>Joyner</u> sets out "clear boundaries" for legislative prayer:

> [L]egislative prayer must strive to be nondenominational so long as that is reasonably possible – it should send a signal of welcome rather than exclusion.  It should not reject the tenets of other faiths in favor of just one.  Infrequent references to specific deities, standing alone, do not suffice to make out a constitutional case.

---

[9] The Fourth Circuit's 2008 holding in <u>Turner v. City of Fredericksburg</u>, 534 F.3d 352 (4th Cir. 2008), <u>cert. denied</u>, 555 U.S. 1099 (2009), is consistent.  In <u>Turner</u>, an ordained minister and member of the City Council of Fredericksburg, Virginia sought to include a reference to Jesus Christ in his prayer opening City Council meetings, contrary to Council policy of opening its meetings with nonsectarian prayer.  Retired Supreme Court Justice Sandra Day O'Connor, writing for the Fourth Circuit panel, dismissed Turner's request, concluding as follows:

> The Council's decision to provide only nonsectarian legislative prayers places it squarely within the range of conduct permitted by <u>Marsh</u> and <u>Simpson</u>.  The restriction that prayers be nonsectarian in nature is designed to make the prayers accessible to people who come from a variety of backgrounds, not to exclude or disparage a particular faith.  The Council's decision to open its legislative meetings with nondenominational prayers does not violate the Establishment Clause.

534 F.3d at 356.

> But legislative prayers that go further – prayers in a particular
> venue that repeatedly suggest the government has put its weight
> behind a particular faith – transgress the boundaries of the
> Establishment Clause.  Faith is as deeply important as it is deeply
> personal, and the government should not appear to suggest that
> some faiths have it wrong and others got it right.

653 F.3d at 349.  By consistently opening its meetings with Christian prayers delivered by Board

members, the Board plainly has run afoul of Joyner's "clear boundaries."

## C.

Despite the clear circuit and Supreme Court precedent controlling the decision of this

court, the Board argues that the court lacks jurisdiction to determine whether prayer by a

governmental body violates the Establishment Clause.  Citing the Eleventh Circuit's opinion in

Pelphrey v. Cobb County, 547 F.3d 1263 (11th Cir. 2008), and the Second Circuit's decision in

Galloway v. Town of Greece, 681 F.3d 20 (2d Cir. 2012), the Board argues that a court is

incapable of drawing a line between governmental conduct – here, prayer – which does and does

not violate the Establishment Clause.  Again, the Board's argument both misses the point and

ignores the holdings of those cases.  To be sure, it is not the province of the court to "parse the

content of a particular prayer," Marsh, 463 U.S. at 795; however, the hands-off approach

advocated by the Board would render a court powerless to review an Establishment Clause

challenge to the advancement of one religion by the government.  The Fourth Circuit in Joyner

rejected this very argument:

> Quite simply, this stark approach leaves the court without the
> ability to decide the case, by barring any substantive consideration
> of the very practice under challenge.  It is to say the least an odd
> view of the judicial function that denies courts the right to review
> the practice at issue.  For to exercise no review at all – to shut our
> eyes to patterns of sectarian prayer in public forums – is to
> surrender the essence of the Establishment Clause and allow
> government to throw its weight behind a particular faith.  Marsh
> did not countenance any such idea.

653 F.3d at 351.

Nor do the holdings in Pelphrey or Galloway provide any support to the Board's position.

In Joyner, the Fourth Circuit reconciled the Eleventh Circuit's decision in Pelphrey by noting

that the court's decision to uphold the prayer policy of Cobb County principally relied on the fact

that in that case "the prayers, taken as a whole, did not advance any particular faith."  653 F.3d at

353 (citing Pelphrey, 547 F.3d at 1278).[10]  The Joyner court continued:

> In other words, the Pelphrey court adopted the same approach we
> did in Wynne and Simpson:  it determined as a threshold matter
> whether the invocations exploited the opportunity for legislative
> prayer.  Indeed, the Eleventh Circuit made this point itself,
> observing that the "Fourth Circuit read[s] Marsh [ ] as we do."
> [547 F.3d] at 1273.  It further noted that Wynne and Simpson had
> likewise focused their analysis on the threshold inquiry of whether
> or not the prayer opportunity had "been exploited to proselytize or
> advance" a particular faith.  Id. at 1273 (quoting Marsh, 463 U.S.
> at 794-95).

Joyner, 653 F.3d at 353.  In contrast, just as in Joyner, the consistent practice of the Pittsylvania

County Board of Supervisors has been to open each official meeting with a overtly Christian

prayer.  As was true in Joyner, "the prayers here, taken as a whole, 'advance[d one] single faith'

to the exclusion of all others."  Id. (quoting Pelphrey, 547 F.3d at 1277).

In Galloway, the Second Circuit agreed with Joyner and the decisions of other circuits "to

the extent that these circuit cases stand for the proposition that a given legislative prayer practice,

viewed in its entirety, may not advance a single religious sect. . . ."  Galloway, 681 F.3d at 28.

While the Second Circuit in Galloway was uncomfortable in applying a test which drew a line

between sectarian and non-sectarian prayer, it did not, as the Board would have this court do,

wash its hands of the Establishment Clause issue.  Rather, the Second Circuit proposed an

---

[10] The prayers were offered by Christian, Jewish, Unitarian, and Muslim speakers, which the court noted represented "a wide cross-section of the County's religious leaders."  Pelphrey, 547 F.3d at 1277.

alternate totality of the circumstances test, i.e., "whether the town's practice, viewed in its totality by an ordinary, reasonable observer, conveyed the view that the town favored or disfavored certain religious beliefs." Id. at 29.  In short, neither Pelphrey nor Galloway supports the Board's argument that a court must abstain from deciding whether sectarian prayers advanced by a governmental entity run afoul of the Establishment Clause.[11]

Other arguments advanced by the Board also ask the court to disregard binding precedent in this circuit, which the court cannot do.  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larsen v. Valente, 456 U.S. 228, 244 (1982).  The Board's practice of consistently opening its meetings with Christian prayer violates this command.

### III.

Finally, in her summary judgment briefs and at oral argument, Hudson asks the court to find that the conduct of the Board following issuance of the preliminary injunction in this case violates the Establishment Clause.  Hudson contends that when faced with the preliminary injunction prohibiting routine sectarian prayer delivered by Board members, certain members of the Board invited local clergy to offer Christian prayers during the "Hearing of the Citizens" public comment portion of Board meetings.  Hudson complains that this, too, violates the Establishment Clause because the members of the Board, upon hearing these prayers from citizens, bowed their heads or said "Amen."  Hudson argues that this practice, coming as it does on the heels of years of Christian prayers delivered by Board members, reflects approval and solidarity with the Christian prayers offered by citizens.  Hudson argues that this conduct violates the Establishment Clause, citing Borden v. School District of Township of East

---

[11] To be sure, given the undisputed fact that the Board routinely opened its meetings with Christian prayer, the conduct of the Board here plainly fails Galloway's totality of circumstances test.

Brunswick, 523 F.3d 153 (3d Cir. 2008), and Doe v. Duncanville School District, 70 F.3d 402 (5th Cir. 1995), cases involving the participation of school coaches in sectarian prayer.

These allegations are not part of the complaint filed in this case, nor has any amended complaint been filed making this subsequent Board practice an issue in this case. Because the practices of the Board after the entry of the preliminary injunction are not part of the pleadings in this case, the court cannot rule on them.

## IV.

Consistent with the foregoing and the memorandum opinions entered on February 3, 2012 on the motion to dismiss, Doe v. Pittsylvania County, 842 F. Supp. 2d 906 (W.D. Va. 2012), and the motion for preliminary injunction, Doe v. Pittsylvania County, 842 F. Supp. 2d 927 (W.D. Va. 2012), it is clear that Hudson is entitled to summary judgment on the claims alleged in the complaint and that a permanent injunction must be entered. Accordingly, Hudson's motion for summary judgment (Dkt. # 57) is **GRANTED**, to the extent it concerns the practice of the Board of opening each of its meetings with sectarian prayers led by Board members, as alleged in the complaint. The Board's motion for summary judgment (Dkt. # 59) is **DENIED**.

As set forth in the accompanying Order, the Board is **ENJOINED** from repeatedly opening its meetings with prayers associated with any one religion, which practice has the unconstitutional "effect of affiliating the government with any one specific faith or belief." Allegheny, 492 U.S. at 603 (citing Marsh, 463 U.S. at 794-95); accord Wynne, 376 F.3d at 302 (approving injunction prohibiting Town Council "from invoking the name of a specific deity associated with any one specific faith or belief in prayers given at Town Council meetings.").

Certainly, defendants may believe that this decision "indicate[s] a hostility toward religion or toward prayer.  Nothing, of course, could be more wrong."  Engel v. Vitale, 370 U.S. 421, 434 (1962).  The founders of our nation, possessing "faith in the power of prayer . . . led the fight for adoption of our Constitution and also for our Bill of Rights with the very guarantees of religious freedom that forbid the sort of governmental activity which [the Board] has attempted here."  Id. at 434-35.  Fifty years ago, Justice Black writing for the Court in the landmark school prayer case of Engel v. Vitale continued:

> These men knew that the First Amendment, which tried to put an end to governmental control of religion and of prayer, was not written to destroy either.  They knew rather that it was written to quiet well-justified fears which nearly all of them felt arising out of an awareness that governments of the past had shackled men's tongues to make them speak only the religious thoughts that government wanted them to speak and to pray only to the God that government wanted them to pray to.  It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance.

370 U.S. at 435.  These words are as true today as they were in 1962.

"The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion'" by government.  Id. at 431-32 (quoting Memorial and Remonstrance against Religious Assessments, II Writings of James Madison 183, 187).  Indeed, viewed in this light, a permanent injunction in this case is necessary to protect, rather than abjure, religious freedom.

Following the lead of the Fourth Circuit in Joyner, the court will not "set forth some sort of template for an ideal legislative prayer policy."  653 F.3d at 354.

> After all . . . "too much judicial fine-tuning of legislative prayer policies risks unwarranted interference in the internal operations of a coordinate branch."  The bar for [Pittsylvania] County is hardly a high one.  Public institutions throughout this country manage to regularly commence proceedings with invocations that provide all the salutary benefits of legislative prayer without the divisive drawbacks of sectarianism.  And religious leaders throughout this country have offered moving prayers on multitudinous occasions that have managed not to hurt the adherents of different faiths.  In the end, the constitutional standard asks of the County no more than what numerous public and governmental entities already meet.

Id. (internal citations omitted).  Therefore, consistent with controlling Fourth Circuit precedent, the permanent injunction in this case is narrowly crafted to respect the religious freedom and constitutional rights of all.

As reflected in the accompanying Order, the Clerk is directed to enter judgment for plaintiff Hudson and strike the case from the docket.  The court will retain jurisdiction over this matter for the purposes of enforcement of the injunction and consideration of any motions for attorney's fees and costs by Hudson, the prevailing party, pursuant to 42 U.S.C. § 1988.

Entered:  March 26, 2013

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge