**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**DANVILLE DIVISION**

| | |
|---|---|
| **BARBARA HUDSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No. 4:11cv043** |
| **v.** | ) |
| | ) |
| **PITTSYLVANIA COUNTY, VIRGINIA and** | ) |
| **BOARD OF SUPERVISORS OF** | ) **By: Michael F. Urbanski** |
| **PITTSYLVANIA COUNTY, VIRGINIA,** | ) **United States District Judge** |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

This matter is before the court on defendants' Motion to Dissolve and/or Modify the Permanent Injunction Pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure (Dkt. No. 113) in light of the May 5, 2014 decision of the United States Supreme Court in <u>Town of Greece v. Galloway</u>, 134 S. Ct. 1811 (2014).

In <u>Town of Greece</u>, the Court disavowed reliance on dicta in <u>County of Allegheny v. ACLU Greater Pittsburgh Chapter</u>, 492 U.S. 573, 603 (1989), for the proposition that legislative prayer should be generic or nonsectarian. 134 S. Ct. at 1821. In so ruling, the Court made it clear in <u>Town of Greece</u> that the government ought not dictate the content of prayers offered at local government meetings. Following <u>Town of Greece</u>, the Permanent Injunction Order in this case will be modified to exclude any suggestion that opening prayers offered at the start of Pittsylvania County Board of Supervisors meetings must be generic or nonsectarian.

At the same time, the Court in <u>Town of Greece</u> recognized that "[t]he inquiry [concerning the proper scope of legislative prayer] remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." <u>Id.</u> at 1825. Considering the facts

of this case, which stand in stark contrast to those in <u>Town of Greece</u>, the court remains convinced that a modified injunction is appropriate and necessary.

There are several critical points of distinction between the facts of <u>Town of Greece</u> and the prayer practice of the Board of Supervisors of Pittsylvania County.  First and foremost, unlike in <u>Town of Greece</u>, where invited clergy and laypersons offered the invocations, the Board members themselves led the prayers in Pittsylvania County.  Thus, unlike in <u>Town of Greece</u>, where the government had no role in determining the content of the opening invocations at its board meetings, the government of Pittsylvania County itself, embodied in its elected Board members, dictated the content of the prayers opening official Board meetings.  Established as it was by the Pittsylvania County government, that content was consistently grounded in the tenets of one faith – Christianity.  As such, the prayer practice in Pittsylvania County had the effect of officially endorsing, advancing and preferring one religious denomination, violating "the clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over another."  <u>Larson v. Valente</u>, 456 U.S. 228, 244 (1982).  Not only did the Pittsylvania County Board members determine the content of the opening prayers at Board meetings, the members often directed the public to participate in the prayers by asking them to stand.  Further, as the Board members themselves served as exclusive prayer providers, persons of other faith traditions had no opportunity to offer invocations.

For these reasons, this case falls outside of the holding in <u>Town of Greece</u> and must remain subject to the court's injunction as modified.  Accordingly, defendants' motion to dissolve the injunction will be **DENIED** and the motion to modify the injunction **GRANTED**.

## I.

Rule 60(b)(5) of the Federal Rules of Civil Procedure allows relief from a judgment on the grounds that "the judgment has been satisfied, released or discharged; it is based on an earlier

Case 4:11-cv-00043-MFU-RSB   Document 124   Filed 05/28/15   Page 2 of 26   Pageid#: 2100

judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." "The significant portion of Rule 60(b)(5) is the final ground, allowing relief if it is no longer equitable for the judgment to be applied. This is based on the historic power of a court of equity to modify its decree in the light of changed circumstances." 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2863 (2d ed. 1995). As Justice Cardozo stated in United States v. Swift & Co., 286 U.S. 106, 114 (1932), "[w]e are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions. . . ." One such changed circumstance is a change in controlling law. See Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright, 364 U.S. 642, 650 n.6 (1961) ("There are many cases where a mere change in decisional law has been held to justify modification of an outstanding injunction."). Moreover, the Permanent Injunction Order in this case provided that the court "will retain jurisdiction over this matter and for the purposes of enforcement of the injunction." Dkt. No. 84. Certainly, if the court retains jurisdiction over this case for the purposes of enforcing the injunction, it has the ability to modify the injunction based on a change in controlling law.

## II.

The Supreme Court's decision in Town of Greece, decided on May 5, 2014, reflects the varying viewpoints on the Court regarding the application of the First Amendment to prayer at local government meetings. The 5-4 opinion of the Court was authored by Justice Kennedy, with whom Chief Justice Roberts and Justice Alito joined. Justices Scalia and Thomas concurred in the judgment and joined the Court's opinion except as to Part II-B. Justices Ginsburg, Breyer, Sotomayor and Kagan dissented.

As the Court observed, the issues addressed in Town of Greece were "fact-sensitive." 134 S. Ct. at 1825. The facts in Town of Greece differ in important respects from those in the instant case.

3

## A.

Greece is a town in upstate New York. For some years, the town began its monthly board meetings with a moment of silence. Beginning in 1999, the town began the practice of inviting a local clergyman to serve as "chaplain for the month" and deliver an invocation. "The prayer was intended to place town board members in a solemn and deliberative frame of mind, invoke divine guidance in town affairs, and follow a tradition practiced by Congress and dozens of state legislatures." Id. at 1816. The town followed an informal method of selecting prayer givers, all of whom were unpaid volunteers. "The town at no point excluded or denied an opportunity to a would-be prayer giver. Its leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation. But nearly all of the congregations in town were Christian; and from 1999 to 2007, all of the participating ministers were too." Id. Importantly, the town had no input into the content of the opening prayers.

> Greece neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content, in the belief that exercising any degree of control over the prayers would infringe both the free exercise and speech rights of the ministers. The town instead left the guest clergy free to compose their own devotions. The resulting prayers often sounded both civic and religious themes.

Id. at 1816 (citation omitted). Susan Galloway and Linda Stephens attended town meetings and voiced complaints that the prayers were offensive, intolerable and an affront to a diverse community. After Galloway and Stephens complained that Christian themes pervaded the prayers, the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver prayers. A Wiccan priestess requested, and was granted, the opportunity to give an invocation. Id. at 1817. In the ensuing Establishment Clause lawsuit, Galloway and Stephens did not seek to stop the prayer practice; rather, they sought an injunction limiting the town to inclusive and ecumenical prayers that referred only to a "generic God" and would not associate the government with any one faith or belief. Id.

4

The district court found the town's practice not to violate the Establishment Clause, concluding that "[a]lthough most of the prayer givers were Christian, this fact reflected only the predominantly Christian identity of the town's congregations, rather than an official policy or practice of discriminating against minority faiths." Id. Nor did the district court conclude that the prayer must be "nonsectarian, at least in circumstances where the town permitted clergy from a variety of faiths to give invocations." Id. The Second Circuit Court of Appeals reversed. "Although the court found no inherent problem in the sectarian content of the prayers, it concluded that the 'steady drumbeat' of Christian prayer, unbroken by invocations from other faith traditions, tended to affiliate the town with Christianity." Id. at 1818.

**B.**

Writing for the Court, Justice Kennedy began the analysis with a discussion of the prior decision in Marsh v. Chambers, 463 U.S. 783 (1983), where "the Court found no First Amendment violation in the Nebraska Legislature's practice of opening its sessions with a prayer delivered by a chaplain paid from state funds. The decision concluded that legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause." Town of Greece, 134 S. Ct. at 1818.

The historic practice of legislative prayer in this country played an important role in both the Marsh and Town of Greece decisions. "As practiced by Congress since the framing of the Constitution, legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." Town of Greece, 134 S. Ct. at 1818. The Court read Marsh to teach:

> [T]hat the Establishment Clause must be interpreted "by reference to historical practice and understandings." County of Allegheny, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part). That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered

5

legislative prayer a benign acknowledgment of religion's role in society.

<u>Town of Greece</u>, 134 S. Ct. at 1819. In terms of the analytical framework to apply, the Court concluded that "<u>Marsh</u> stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the scrutiny of time and political change." <u>Id.</u> (citing <u>Allegheny</u>, 492 U.S. at 670 (opinion of Kennedy, J.), and <u>School Dist. of Abington Township v. Schempp</u>, 374 U.S. 203, 294 (1963) (Brennan, J., concurring)). Resting on the tradition of legislative prayer by chaplains in Congress and state houses, the Court framed the issue in <u>Town of Greece</u> as follows: "The Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures." <u>Id.</u>

In Part II-A of its decision,[1] the Court rejected Galloway and Stephens' argument that legislative prayer must be nonsectarian. In so doing, the Court put to rest the contention that its prior decision in <u>County of Allegheny</u> required legislative prayer to be generic or nonsectarian, stating that this notion "was disputed when written and has been repudiated by later cases." 134 S. Ct. at 1821.[2]

> To hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact. <u>Cf. Hosanna – Tabor Evangelical Lutheran Church and School v. EEOC</u>, 565 U.S. ___, ___, 132 S. Ct. 694, 705-

---

[1] Five Justices joined Part II-A of the Court's decision.

[2] <u>County of Allegheny</u> concerned religious displays, specifically a crèche and a menorah, on government property. The majority opinion, authored by Justice Blackmun, expressly disagreed with the interpretation of <u>Marsh</u> taken by the dissent in an opinion authored by Justice Kennedy. <u>County of Allegheny</u>, 492 U.S. at 604 ("Justice Kennedy's reading of <u>Marsh</u> would gut the core of the Establishment Clause, as this Court understands it."). The tide has now turned, and Justice Kennedy's dissent in <u>County of Allegheny</u> has become the majority position in <u>Town of Greece</u>.

706, 181 L. Ed. 2d 650 (2012). Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior. Engel v. Vitale, 370 U.S. 421, 430, 82 S. Ct. 1261, 8 L. Ed. 2d 601 (1962).

* * * * *

Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.

Id. at 1822-23.

At the same time, the Court was quick to note that its decision "does not imply that no constraints remain on its content." Id. at 1823.

The relevant constraint derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage. Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function. If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.

* * * * *

Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. Marsh, indeed, requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer. 463 U.S. at 794-795, 103 S. Ct. 3330.

Id. at 1823-24.

The Court concluded that the practice employed by the town of Greece of having ministers and laypersons open town board meetings with a prayer was consistent with the historical tradition

in this country of having chaplains open legislative sessions with a prayer both in Congress and in

state legislatures.[3]

> The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one. That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing. The quest to promote "a 'diversity' of religious views" would require the town "to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each," Lee, 505 U.S. at 617, 112 S. Ct. 2649 (Souter, J., concurring), a form of government entanglement with religion that is far more troublesome than the current approach.

Id. at 1824.

In Part II-B of the decision,[4] Justice Kennedy addressed the concern that prayer in the intimate setting of local government meetings "differs in fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation." Id. at 1824-25. Noting that the government may not coerce its citizens to support or participate in a religious observance, Justice Kennedy observed that the "inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." Id. at 1825. Justice Kennedy noted the enduring practice of legislative prayer and the fact that the "principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a

---

[3] Indeed, in this circuit, so long as the prayer opportunity is reasonably open to all creeds, such a practice has long been approved. See Simpson v. Chesterfield Cnty. Bd. of Supervisors, 404 F.3d 276, 284 (4th Cir. 2005) ("Reflecting the effort to include diverse creeds, Chesterfield has had a wide variety of prayers, the richness of which is quite revealing.").

[4] Only Chief Justice Roberts and Justice Alito joined Part II-B of Justice Kennedy's opinion.

8

moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." Id.

Significantly, Justice Kennedy distinguished the town of Greece's practice from one in which board members directed public participation:

> The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive.

Id.

Justice Kennedy noted the ceremonial nature of the invocations, concluding that "[t]he inclusion of a brief, ceremonial prayer as part of a larger exercise in civic recognition suggests that its purpose and effect are to acknowledge religious leaders and the institutions they represent rather than to exclude or coerce nonbelievers." Id. at 1827.

In a concurring opinion joined by Justice Scalia, Justice Alito commended the practice employed in Congress where guest chaplains are advised that "they should keep in mind that they are addressing members from a variety of faith traditions," noted the practical difficulty of composing generic prayer in an increasingly diverse country, and cautioned that government screening of proposed prayers "will inevitably encounter sensitive problems." 134 S. Ct. at 1829-30.[5]

---

[5] As illustrative of these "sensitive problems," Justice Alito posed the following questions: "Must a town screen and, if necessary, edit prayers before they are given? If prescreening is not required, must the town review prayers after they are delivered in order to determine if they were sufficiently generic? And if a guest chaplain crosses the line, what must the town do? Must the chaplain be corrected on the spot? Must the town strike this chaplain (and perhaps his or her house of worship) from the approved list?" Id. at 1830. Plainly, Justice Alito was concerned with government involvement in the content of legislative prayer.

9

Justice Alito declined to condemn the town's informal and imprecise manner of recruiting guest chaplains, noting that a "municipality should not be held to have violated the Constitution simply because its method of recruiting guest chaplains lacks the demographic exactitude that might be regarded as optimal." Id. at 1831. Justice Alito concluded his concurrence as follows:

> This brings me to my final point. I am troubled by the message that some readers may take from the principal dissent's rhetoric and its highly imaginative hypotheticals. For example, the principal dissent conjures up the image of a litigant awaiting trial who is asked by the presiding judge to rise for a Christian prayer, of an official at a polling place who conveys the expectation that citizens wishing to vote make the sign of the cross before casting their ballots, and of an immigrant seeking naturalization who is asked to bow her head and recite a Christian prayer. Although I do not suggest that the implication is intentional, I am concerned that at least some readers will take these hypotheticals as a warning that this is where today's decision leads – to a country in which religious minorities are denied the equal benefits of citizenship.
>
> Nothing could be further from the truth. All that the Court does today is to allow a town to follow a practice that we have previously held is permissible for Congress and state legislatures. In seeming to suggest otherwise, the principal dissent goes far astray.

Id. at 1834.

Justice Thomas joined the opinion of the Court except for Part II-B, and concurred in the judgment. In Part I of his concurring opinion, Justice Thomas articulated his unique view that the Establishment Clause ought not be incorporated against the states and, as such, has no application to municipal activities. Justice Scalia joined Part II of Justice Thomas' concurrence, taking the position that the Establishment Clause is not violated by "subtle coercive pressures" associated with the expression of contrary religious views in a legislative forum. Rather, Justice Thomas viewed the Establishment Clause as only prohibiting "actual legal coercion," which he defined as the exercise of "government power in order to exact financial support of the church, compel religious observance, or control religious doctrine." 134 S. Ct. at 1837.

10

Justice Breyer opened his separate dissenting opinion by agreeing that this is a "fact-sensitive" case. 134 S. Ct. at 1838. Justice Breyer focused on the town's decade-long practice of opening its meetings with Christian prayers and the fact that the town made no significant effort to inform the area's non-Christian houses of worship of the prayer opportunity. Justice Breyer viewed these facts as significant. "The significance is that, in a context where religious minorities exist and where more could easily have been done to include their participation, the town chose to do nothing." Id. at 1840. The "importance of making more of an effort to include members of other denominations" was enhanced where citizens with business before the town board were present. Id. Finally, Justice Breyer expressed concern that the town made no effort to promote an inclusive prayer policy along the lines of the guidelines employed in the U.S. House of Representatives, "which are designed to encourage the sorts of prayer that are consistent with the purpose of an invocation for a government body in a religiously pluralistic Nation." Id. at 1840-41.

Justice Kagan, joined by Justices Ginsburg, Breyer and Sotomayor, also dissented, concluding that "the Town of Greece's prayer practices violate that norm of religious equality – the breathtakingly generous constitutional idea that our public institutions belong no less to the Buddhist or Hindu than to the Methodist or Episcopalian." 134 S. Ct. at 1841.

> [T]he Town of Greece should lose this case. The practice at issue here differs from the one sustained in Marsh because Greece's town meetings involve participation by ordinary citizens, and the invocations given – directly to those citizens – were predominantly sectarian in content. Still more, Greece's Board did nothing to recognize religious diversity: In arranging for clergy members to open each meeting, the Town never sought (except briefly when the suit was filed) to involve, accommodate, or in any way reach out to adherents of non-Christian religions. So month in and month out for over a decade, prayers steeped in only one faith, addressed toward members of the public, commenced meetings to discuss local affairs and distribute government benefits. In my view, that practice does not square with the First Amendment's promise that every citizen, irrespective of her religion, owns an equal share in her government.

Id. at 1842.  Justice Kagan opened her dissent by referencing three hypothetical scenarios where government officials, reciting the same prayers from the Town of Greece record, would cross a constitutional line.  The first involves a judge calling a court to order and instructing the parties present for the case to rise for an opening prayer.[6]  The second is where voters standing in line to vote are asked to join in a prayer.  Finally, Justice Kagan references a sectarian prayer offered at a naturalization ceremony.  Justice Kagan's concern in each scenario is the alignment of government with a particular religious creed.

> By authorizing and overseeing prayers associated with a single religion – to the exclusion of all others – the government officials in my hypothetical cases (whether federal, state, or local does not matter) have violated that foundational principle.  They have embarked on a course of religious favoritism anathema to the First Amendment.

Id. at 1844.

Justice Kagan disagreed that the practices of the town of Greece fell squarely within the traditional mold of legislative prayer.  "Rather, what I say throughout this opinion is that in this citizen-centered venue, government officials must take steps to ensure – as none of Greece's Board members ever did – that opening prayers are inclusive of different faiths, rather than always identified with a single religion."  Id. at 1846 n.2.  Justice Kagan distinguished historic legislative prayer approved in Marsh from the practice of the town board of Greece in three principal respects.  First, she noted that citizens are not active participants in the legislative process in state or national legislatures as they are in local government meetings.  Second, the audiences are different.  In that regard, Justice Kagan disagreed with the majority's characterization that the prayers offered in the Greece board meetings were directed at the board, taking the position that "the prayers there are

---

[6] In North Carolina Civil Liberties Union Foundation v. Constangy, 947 F.2d 1145 (4th Cir. 1991), the Fourth Circuit Court of Appeals found an opening prayer by a North Carolina state court judge to violate the Establishment Clause. "For a judge to engage in prayer in court entangles governmental and religious function to a much greater degree than a chaplain praying before the legislature." Id. at 1149.

directed squarely at the citizens." Id. at 1849. Third, Justice Kagan noted the difference in the character and content of the prayers at issue in Marsh and Town of Greece. While the chaplain in Marsh "had removed all explicitly Christian references at a senator's request . . . no one can fairly read the prayers from Greece's Town meetings as anything other than explicitly Christian – constantly and exclusively so." Id. at 1848. In Justice Kagan's view, the tradition of legislative prayer compelling the holding in Marsh was absent in the prayer practices of the town of Greece. "None of the history Marsh cited – and none the majority details today – supports calling on citizens to pray, in a manner consonant with only a single religion's beliefs, at a participatory public proceeding, having both legislative and adjudicative components." Id. at 1849. Considering these differences, Justice Kagan wrote that "the majority thus errs in assimilating the Board's prayer practice to that of Congress or the Nebraska legislature. Unlike those models, the Board is determinedly – and relentlessly – noninclusive." Id. at 1852.

### III.

### A.

The majority opinion in Town of Greece rejects the argument that the opening prayers at governmental meetings must be generic or nonsectarian. In the Permanent Injunction Order entered in this case on March 27, 2013, the court, quoting from the Supreme Court's 1989 decision in County of Allegheny, enjoined the Board of Supervisors of Pittsylvania County "from repeatedly opening its meetings with prayers associated with any one religion, which practice has the unconstitutional 'effect of affiliating the government with any one specific faith or belief.'" Dkt. No. 84. The Permanent Injunction Order cited the Fourth Circuit Court of Appeals' decision in Wynne v. Town of Great Falls, 376 F.3d 292, 302 (4th Cir. 2004), cert. denied, 545 U.S. 1152 (2005), and quoted the Fourth Circuit's opinion in Joyner v. Forsyth County, 653 F.3d 341, 349 (4th Cir. 2011), cert. denied, 132 S. Ct. 1097 (2012), for the proposition that opening prayers at governmental

13

meetings ought to "'strive to be nondenominational so long as that is reasonably possible – it should send a signal of welcome rather than exclusion. It should not reject the tenets of other faiths in favor of just one.'" Dkt. No. 84.

Given the holding in <u>Town of Greece</u>, the court does not believe that either the Board of Supervisors or the court should prescribe the content of any ceremonial prayers offered at the opening of Pittsylvania County Board of Supervisors meetings. Thus, to the limited extent that the Permanent Injunction Order can be read to require generic or nonsectarian prayer, it will be **MODIFIED**. However, in light of the fact-sensitive inquiry concerning the proper scope of legislative prayer, the court remains convinced that an injunction is appropriate in this case.

**B.**

Both in Greece and in Pittsylvania County, the local governing bodies opened their meetings with prayers that were consistently Christian. To that extent, the cases bear some similarity. The similarity between the facts of <u>Town of Greece</u> and the instant case ends there, however, as the prayer practices employed in Greece differ markedly from those used in Pittsylvania County. Of critical significance is the fact that unlike the ceremonial prayers offered by the chaplain of the Nebraska legislature in <u>Marsh</u> and the invited "chaplain of the month" in <u>Town of Greece</u>, the prayers in Pittsylvania County were delivered by the Board members themselves. In this setting, there is no distinction between the prayer giver and the government. They are one and the same.

Central to Part II-A of the Court's decision in <u>Town of Greece</u> is the notion that there be some separation between the government and the prayer giver. "Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." 134 S. Ct. at 1822-23. In other words, while the tradition of legislative prayer allows a governmental body to formalize its proceedings by "offering a brief, solemn, and respectful prayer to open its

14

monthly meetings," id. at 1825, the government may not dictate the content of that prayer. In contrast to the practice in Greece, where the town board invited clergy to serve as "chaplain of the month" but had no role in determining the content of the prayers they gave, the government in Pittsylvania County does not merely supervise or censor the content of the prayers – the government authors the prayers. The Supreme Court's abiding concern with the involvement of government in religious matters is magnified in Pittsylvania County where the Supervisors themselves deliver, and therefore determine the content of, the opening prayers.

The tradition of legislative prayer practiced in the Nebraska legislature and the United States Congress was an important part of both the Marsh and Town of Greece decisions. As the Court noted in Town of Greece, "Marsh is sometimes described as 'carving out an exception' to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to 'any of the formal "tests" that have traditionally structured' this inquiry. [463 U.S.] at 796, 813 (Brennan, J., dissenting). The Court in Marsh found those tests unnecessary because history supported the conclusion that legislative invocations are compatible with the Establishment Clause." Town of Greece, 134 S. Ct. at 1818. But that tradition – having chaplains deliver an opening invocation for the benefit of the legislators – is a far cry from the practice at issue in Pittsylvania County, where the elected members of the governing body themselves deliver opening invocations to the assembled citizens.[7]

---

[7] The Board argues that there is no constitutional difference between a prayer given by a Board member and one given by an invited chaplain, suggesting that each is "considered 'government speech' for purposes of legislative prayer analysis." Defendants' Mem. in Support of Motion to Dissolve and/or Modify the Permanent Injunction, Dkt. No. 114, at 13 n.3. For this proposition, the Board cites only Rosenberger v. Rector and Board of Visitors of the University of Virginia, 515 U.S. 819, 833 (1995). But Rosenberger was not a prayer case; it concerned whether the denial of certain funding by the university amounted to viewpoint discrimination. Indeed, there is nothing in the Rosenberger decision that blurs the rather pointed distinction between prayers delivered exclusively by government officials to their constituents and prayers offered for the benefit of a legislative body by a chaplain or invited clergy. As the court in Lund v. Rowan, No. 1:13cv207, 2015 WL 2072345, at *9 n.5 (M.D.N.C. May 4, 2015) recently noted:

> Defendant argues that in approving of the Nebraska legislature's appointment of a paid chaplain position, the Supreme Court in Marsh approved of government officials providing prayers, which would extend to the Commissioners as government officials. Defendant's argument misconstrues

In addition, because the Supervisors, all of whom are of one faith, determine the content of and lead the prayers, there is no opportunity for persons of other faith traditions to offer prayers to open Board meetings. They are, in fact, shut out of the process. Thus, unlike in <u>Town of Greece</u>, where persons of other faiths could, and occasionally did, give the invocations, no one but the government had that opportunity in Pittsylvania County. At its core, the control exercised by the Pittsylvania County Board of Supervisors over the content of the prayers delivered at its Board meetings goes to the heart of the Establishment Clause, particularly where the Board consistently engages in prayer associated with one faith tradition.[8]

Moreover, not only did the Pittsylvania County Supervisors stand and bow their heads during prayers, they often solicited similar gestures by the public, in contrast to the practice in <u>Town of Greece</u>. For example, prior to the prayer on October 3, 2011, the Chairman of the Board of Supervisors told the assembled citizens: "All rise if you can rise." Second Suppl. Decl. of Rebecca K. Glenberg, Dkt. No. 24, at ¶ 6. As the majority opinion in <u>Town of Greece</u> noted, such a request from the government makes a difference. 134 S. Ct. at 1826 ("The analysis would be different if town board members directed the public to participate in the prayers."). On at least one occasion, the Board went a step further. On September 20, 2011, the Pittsylvania County Supervisor delivering the opening prayer directed: "If you don't want to hear this prayer, you can leave. Please

---

<u>Marsh</u> and misconceives the role of a legislator. To say that <u>Marsh</u> held that any person drawing a paycheck from the government is eligible to deliver a legislative prayer ignores the specific history of legislative prayer. It also ignores that legislators, unlike an appointed or volunteer chaplain, are elected decisionmakers who deliberate within the legislative body to whom the prayers are allegedly directed. An appointed chaplain possesses no such legislative, policy-making power.

At the same time, the court does not mean to suggest that prayers by Board members will always be unconstitutional. Drawing again from <u>Lund v. Rowan</u>, "[t]he prayer-givers' identities are significant here in relation to the surrounding circumstances. Under a different, inclusive prayer practice, Commissioners might be able to provide prayers, but that is not the case before the Court." <u>Id.</u> at 18 n.4. The same is true here.

[8] In the two years prior to the injunction, 87% of the prayers delivered by the Supervisors mentioned "Jesus," "Christ" or "Jesus Christ." Decl. of Rebecca K. Glenberg, Dkt. No. 58-2, at ¶¶ 2-10. It is clear from public statements made by Board members that the Christian content of their prayers is of paramount importance. <u>See</u> Ex. 4 to Reply Mem. in Supp. of Mot. for Prelim. Inj., Dkt. No. 20-3.

16

stand up." Second Suppl. Decl. of Rebecca K. Glenberg, Dkt. No. 24, at ¶ 5. This comes far too close to "singl[ing] out dissidents for opprobrium," 134 S. Ct. at 1826, and transcends the boundaries of permissible legislative prayer demarcated in Town of Greece. The fact that the Pittsylvania County Board compels public participation in the prayers in addition to dictating their content compounds the problem and tends to create a coercive atmosphere.

The court in Lund v. Rowan, considering facts on all fours with those present here, addressed the coercion inherent in such practices.

> The context in the present case is one in which the government, through elected, policymaking officials, engages in a religious exercise (almost exclusively representing one faith) directly before making decisions on public matters and addressing the concerns of county citizens and residents. The character of the particular coerced activity is that of the government asking for public participation in a prayer exercise, so that non-adherents in the majority faith must either acquiesce to the exercise or effectively brand themselves as outsiders by not following along.
>
> * * * * *
>
> While attendance at Board meetings is of course not mandatory, for concerned citizens wishing to advocate for matters of local import with direct impact on local citizens' lives, attendance and maintaining the Board's respect are of utmost importance. When Plaintiffs wish to advocate for local issues in front of the Board, they should not be faced with the choice between staying seated and unobservant, or acquiescing to the prayer practice of the Board, as joined by most, if not all, of the remaining public in attendance.
>
> * * * * *
>
> As past coercion cases and the Town of Greece plurality emphasize, context is key in Establishment Clause violations involving coercive practices. Here, the Board's legislative prayer practice leads to prayers adhering to the faiths of five elected Commissioners. The Board maintains exclusive and complete control over the content of the prayers, and only the Commissioners deliver the prayers. In turn, the Commissioners ask everyone – including the audience – to stand and join in what almost always is a Christian prayer. On the whole, these details and context establish that Defendant's prayer practice is an unconstitutionally coercive practice in violation of the Establishment Clause. The practice "sends the . . . message to

17

members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" Santa Fe [Indep. Sch. Dist. v. Doe], 530 U.S. [290,] 309-310, 120 S. Ct. [2266,] 2279 [2000] (quoting Lynch v. Donnelly, 465 U.S. 668, 688, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring)). The Board's practice contravenes the Establishment Clause by dividing along religious lines and exacting coercive pressure on nonadherents to conform to the majority-represented faith. Nonadherents, such as Plaintiffs, would feel pressured to conform so as to not diminish their political clout or social standing. "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing, officially approved religion is plain." Engle v. Vitale, 370 U.S. 421, 430-431, 82 S. Ct. 1261, 1267, 8 L. Ed. 2d 601 (1962).

* * * * *

The Court, therefore, finds that Defendant's prayer practice, in directing the public to stand and pray, violates the bedrock principles of the Establishment Clause, in that it serves as an unconstitutionally coercive practice.

2015 WL 2072345, at *18-19 (W.D.N.C. May 4, 2015).

The coercive nature of the Pittsylvania County Board's prayer practice is evident from what transpired after Barbara Hudson wrote the Board on August 11, 2011, requesting that it change its prayer practice to conform with the Fourth Circuit's July 29, 2011 opinion in Joyner v. Forsyth County, 653 F.3d 341 (4th Cir. 2011). Before Hudson's letter, one member of the Board would open Pittsylvania County Board meetings with a prayer. After Hudson complained, the Pittsylvania County Board of Supervisors took its opening prayer practice to another level. As Hudson testified, "[a]t the board meeting on August 16th, instead of one sectarian prayer, every single member of the board got up and did Christian prayers, knowing that it was me. I felt that I was being assaulted. They were using prayer to assault." Hudson Dep., Dkt. No. 60-3, at 214. Moreover, after David Gresham, a resident of Franklin County, spoke in favor of Hudson's position on the Pittsylvania County Board's prayer practices, the Board amended its bylaws to preclude non-Pittsylvania County

18

residents or property owners from speaking at Board meetings. Plaintiff's Mem. in Supp. of Mot. for Summ. J., Dkt. No. 58, at ¶¶ 21-23. To be sure, there is no love lost between Hudson and the Pittsylvania County Board. Indeed, the Board contends that her opposition to the Board's prayer practice is simply part of a broader pattern of vexatious litigation against the County. In any event, what happened in Pittsylvania County after Hudson complained stands in stark contrast to what happened in the town of Greece after Galloway and Stephens objected to its prayer practice. In Greece, "[a]fter respondents complained that Christian themes pervaded the prayers, to the exclusion of citizens who did not share those beliefs, the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver prayers. A Wiccan priestess who had read press reports about the prayer controversy requested, and was granted, an opportunity to give the invocation." 134 S. Ct. at 1817. This further illustrates the factual differences between these two cases. In response to a complaint, the town of Greece took steps to become more inclusive. Pittsylvania County took the opposite approach.

Finally, in <u>Town of Greece</u>, "the principal audience for these invocations [was] not, indeed, the public but the lawmakers themselves." 134 S. Ct. at 1825. The same cannot be said for Pittsylvania County. In Pittsylvania County, the Supervisors led the prayers and asked the audience to stand while doing so, rendering the prayer practice far less of "an internal act" directed at the Board than was the case in both <u>Marsh</u> and <u>Town of Greece</u>. 134 S. Ct. at 1825. For example, the August 17, 2010 prayer stated:

> Gracious heavenly father, we thank you for the opportunity to address you, and thank you O Lord, because you made all of this possible. You are our God, you are our King, you are the reason we are here. God, without you, and Jesus, without you, there would be no life on earth, and we would not be able to sit down and express our Christian values before the good people of Pittsylvania County. Amen.

Decl. of Rebecca K. Glenberg in Supp. of Mot. for Prelim. Inj., Dkt. No. 58-2, at ¶ 7. Such prayers delivered by the Board to the assembled citizens do not fit "within the tradition long followed in Congress and the state legislatures." 134 S.Ct. at 1819. While the majority and principal dissenting opinions in Town of Greece disagreed on the proper interpretation of the facts of that case, both Justices Kennedy and Kagan deemed the intended audience of the prayers to be significant. Id. at 1825-26, 1847-48 (Kagan, J., dissenting). In each of their minds, there is a more significant Establishment Clause concern where, as here, the prayers are delivered to the public by the governing body, as opposed to prayers directed to the governing body.

Pittsylvania County's pattern and practice of Board-led prayers sounding in only one faith, in which the audience is asked to rise and participate, is distinguishable from the prayer practice in Town of Greece and violates the Establishment Clause of the United States Constitution. In this fact-sensitive inquiry, the exclusive role of the Pittsylvania County Board in leading the prayers and, importantly, dictating their content, is of constitutional dimension and falls outside of the prayer practices approved in Town of Greece.

The Board argues that an injunction is no longer necessary because the Board now opens its meetings with a moment of silence, and prayers, if any, come from citizens during the "Hearing of the Citizens" portion of the meetings. While there is no constitutional problem with the Board's present practice, the injunction remains necessary to keep the Board from returning to its former unconstitutional prayer practice.[9] The injunction in this case, modified as previously explained, therefore continues to be necessary.

---

[9] For example, in commenting on the Board's motion to dissolve the injunction, one member of the Board was quoted in the Chatham Star-Tribune Newspaper as stating: "In the end, God won out as I knew he always would. Hopefully now this motion to vacate the injunction allows the Board of Supervisors to get back to what we were doing before: having Christian prayer in Pittsylvania County." See Resp. to Def. Mot. to Dissolve and/or Modify the Permanent Inj., Dkt. No. 116, at 8 n.2 (quoting Tim Davis, County asks judge to lift injunction on prayer, Chatham Star-Tribune, June 25, 2014, available at http://www.chathamstartribune.com/news/article_ef053478-fc68-11e3-b6f3-0019bb2963f4.html).

## C.

Not only is continuation of the injunction against Pittsylvania County's practice of opening its meetings with government prayer endorsing one religion consistent with the narrow factual holding of Town of Greece, it is supported by existing precedent of the Fourth Circuit Court of Appeals.

Indeed, the prayer practices of the Pittsylvania County Board closely parallel those of the Town Council of Great Falls, South Carolina, invalidated by the Fourth Circuit eleven years ago in Wynne v. Town of Great Falls, 376 F.3d 292 (4th Cir. 2004). As in Pittsylvania County, the Christian prayers opening town meetings in Great Falls were often led by a council member, and citizens customarily stood and bowed their heads. When plaintiff Wynne sought to offer an alternative nonsectarian prayer, her request was refused in favor of the town's customary prayer practice. To be sure, the Fourth Circuit's decision in Wynne relied on the reading of Marsh adopted by Justice Blackmun and the majority in County of Allegheny, which now has been turned aside by Justice Kennedy's majority opinion in Town of Greece. But the entirety of the holding in Wynne cannot be brushed aside. First, as with Pittsylvania County, the Great Falls Town Council members themselves led the opening prayers. As such, the Fourth Circuit held that the opportunity to solemnize a public meeting with an invocation consistent with the tradition of legislative prayer recognized in Marsh "does not, however, provide the Town Council, or any other legislative body, license to advance its own religious views in preference to all others, as the Town Council did here." Id. at 302. Second, the Fourth Circuit rejected the argument that the audience for the prayers was the town council itself. The Wynne court noted: "Thus, in a very real sense, the Town Council has directed Christian prayers at – and thereby advanced Christianity to – the citizens in attendance at its meetings and the citizenry at large." Id. at 301 n.7. Just as Justice Kennedy did in Town of Greece, the Fourth Circuit in Wynne believed the intended audience for the prayers to be an important

consideration.  Here, as in <u>Wynne</u>, the prayers emanate from the Board to the public, a far different situation from the invited "chaplain of the month" prayers in <u>Town of Greece</u>.  In short, although the holding in <u>Wynne</u> relied upon dicta in <u>Allegheny</u> interpreting <u>Marsh</u>, now abrogated by <u>Town of Greece</u>, the facts of <u>Wynne</u> are sufficiently dissimilar from those of <u>Town of Greece</u> such that the result in <u>Wynne</u> would not change even after <u>Town of Greece</u>.[10]

In consistent fashion, the Fourth Circuit approved the prayer policy in <u>Simpson v. Chesterfield County Board of Supervisors</u>, 404 F.3d 276 (4th Cir. 2005), noting both the audience and the inclusive nature of the invocations offered by invited religious leaders.  Writing for the unanimous panel of the Fourth Circuit, Judge Wilkinson addressed the issue of the audience as follows:

> Moreover, Chesterfield, unlike Great Falls, did not invite the citizenry at large to participate during its invocations.  Board members made clear in depositions that the invocation "is a blessing . . . for the benefit of the board," rather than for the individual leading the invocation or for those who might also be present.  In other words, Chesterfield's invocations are "directed only at the legislators themselves," as the court in <u>Wynne</u> explained that they should be.  <u>Id.</u> at 302.

404 F.3d at 284.  In his concurring opinion, Judge Niemeyer emphasized the point.

> Thus, when a governmental body engages in prayer for itself and does not impose that prayer *on the people*, the governmental body is given greater latitude than when the government imposes prayer *on the people*.  When the "people" are involved, the Supreme Court has held that the Establishment Clause "guarantees that government may not coerce *anyone* to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so."

<u>Id.</u> at 289 (quoting <u>Lee v. Weisman</u>, 505 U.S. 577, 587 (1992)).

---

[10] In that regard, the court respectfully disagrees with dictum in footnote 30 in <u>Hewett v. City of King</u>, 29 F. Supp. 3d 584 (M.D.N.C. 2014), where the district court noted in passing that "based on the recent holding in [<u>Town of Greece</u>], the facts in <u>Wynne</u> may now fall within the parameters of permissible legislative prayer."  <u>Id.</u> at 631 n.30.  The issue of legislative prayer was not before the court in <u>Hewett</u>, and, as such, the court did not have an occasion to parse the facts of either <u>Wynne</u> or <u>Town of Greece</u>.

Nor does the Fourth Circuit's legislative prayer decision three years later in <u>Turner v. City Council of Fredericksburg</u>, 534 F.3d 352 (4th Cir. 2008), call for a contrary result.  While it was the city council members themselves who did the praying in Fredericksburg, the city's prayer policy required the opening prayers to be nondenominational, unlike in Pittsylvania County.  When Hasmel Turner, a city council member and ordained minister, insisted on praying in the name of Jesus in violation of the policy, the Mayor called on another council member to deliver the opening prayer.  Turner sued, claiming the policy violated his Free Exercise and Free Speech rights.  In an opinion written by retired Justice Sandra Day O'Connor, sitting by designation, the Fourth Circuit affirmed the district court's grant of summary judgment for the Fredericksburg City Council.  The court first concluded that an opening prayer given by an individual member of the Fredericksburg City Council was government, as opposed to individual or private, speech.  <u>Id.</u> at 354-55.[11]  The court held that Fredericksburg's decision to open its meetings with nondenominational prayers did not violate the Establishment Clause.  Justice O'Connor wrote:

> We need not decide whether the Establishment Clause *compelled* the Council to adopt their legislative prayer policy, because the Establishment Clause does not absolutely dictate the form of legislative prayer.  In <u>Marsh</u>, the legislature employed a single chaplain and printed the prayers he offered in prayerbooks at public expense.  By contrast, the legislature in <u>Simpson</u> allowed a diverse group of church leaders from around the community to give prayers at open meetings.  <u>Simpson</u>, 404 F.3d at 279.  Both varieties of legislative prayer were found constitutional.  The prayers in both cases shared a common characteristic:  they recognized the rich religious heritage of our country in a fashion that was designed to include members of the community, rather than to proselytize.
>
> The Council's decision to provide only nonsectarian legislative prayers places it squarely within the range of conduct permitted by <u>Marsh</u> and <u>Simpson</u>.  The restriction that prayers be nonsectarian in nature is designed to make the prayers accessible to people who

---

[11] The court noted that "[w]hile Turner is the literal speaker, he is allowed to speak only by virtue of his role as a Council member.  Council members are the only ones allowed to give the Call to Order," <u>id.</u> at 355, which included the opening prayer.  In similar fashion, before the injunction issued in this case, only Pittsylvania County Board of Supervisor members delivered the opening prayers at Board meetings.

> come from a variety of backgrounds, not to exclude or disparage a particular faith. The Council's decision to open its legislative meetings with nondenominational prayers does not violate the Establishment Clause.

534 F.3d at 356. Because Turner was "free to pray on his own behalf, in nongovernmental endeavors, in the manner dictated by his conscience," the Fourth Circuit found no violation of his First Amendment or Free Exercise rights. Id. at 356.

It is worth noting that the court has difficulty distinguishing the facts of the Fourth Circuit's decision in Joyner v. Forsyth County, 653 F.3d 341 (4th Cir. 2011), from those of Town of Greece. In Joyner, as in Town of Greece, the opening invocations in question were delivered by local religious leaders, and the Fourth Circuit found that the county's prayer practice violated the Establishment Clause. Judge Niemeyer's dissent in Joyner reads very much like Justice Kennedy's majority opinion in Town of Greece, placing emphasis on the lack of government involvement in the content of the prayer: "In determining what it means to 'advance' one religion or faith over others, the touchstone of the analysis should be whether *the government* has placed its imprimatur, deliberately or by implication, on any one faith or religion." 653 F.3d at 362 (Niemeyer, J. dissenting) (citing Marsh, 463 U.S. at 792-94) (emphasis in original). Judge Niemeyer continued:

> Joyner and Blackmon argued that Forsyth County has effectively advanced Christianity over other religions, even though the County's policy was neutral and inclusive, because it turned out that most of the prayers offered were in fact Christian prayers. But this argument fails to recognize the nature of the prayer was not determined by the County or by any policy the County adopted or implemented. The frequency of Christian prayers was not the wish or preference of Forsyth County, and the County in no way affirmed one faith over another. The frequency of Christian prayer was, rather, the product of demographics and the choices of the religious leaders who responded out of their own initiative to the County's invitation. The County provided the most inclusive policy possible, but it could not control whether the population was religious and which denominations' religious leaders chose to accept the County's invitation to offer prayer. Moreover, there is no evidence to suggest that the Board attempted to game the demographics of Forsyth County by manipulating the list of religious leaders to ensure that

24

only Christian prayer would be offered. The Board never even informed itself of the religious demographics of the County. Thus, sectarian references were the product of free choice and religious leaders' composing their own invocations, without any control or review of content by the County.

Id. at 363. Like Justice Kennedy in Town of Greece, Judge Niemeyer's dissent in Joyner focuses on the lack of government control over the content of the prayer in Forsyth County and the inclusive nature of its prayer policy. Here, in contrast, the content of the opening invocations in Pittsylvania County was dictated by its Board members, open to no one but them, and delivered to the public.

## IV.

Central to the decision of the Supreme Court in Town of Greece is the notion that the government, whether county officials or courts, ought not be dictating the content of legislative prayer. This central premise is true to long-standing jurisprudence that "each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." Engel v. Vitale, 370 U.S. 421, 435 (1962). By opening its meetings with prayers led by Board members, the Supervisors of Pittsylvania County determined the content of the prayers offered at Board meetings and did so by consistently referencing the tenets of one denomination. In so doing, the Board involved itself "in religious matters to a far greater degree" than was the case in Town of Greece, 134 S. Ct. at 1822. Moreover, by delivering the prayers to the assembled public and asking them to stand for the prayers, the Board members "directed the public to participate in the prayers." Id. at 1826. Finally, because the Board itself determined the content of the Pittsylvania County prayers, persons of other faiths had no opportunity to offer opening prayers in their faith traditions. As such, the Supreme Court's decision in Town of Greece was decided on very different facts, and its decision does not alter the conclusion that the prayer practice of the

25

Board of Supervisors of Pittsylvania County violated the Establishment Clause of the First Amendment of the United States Constitution.

While the injunction in this case will be modified to eliminate any suggestion that legislative prayer must be nonsectarian, the Board's exclusive practice of determining the content of and leading the citizens of Pittsylvania County in prayer associated with one faith tradition at the opening of Board meetings will remain enjoined.

Consistent with this Memorandum Opinion, the court will enter an Order **DENYING** the motion to dissolve the injunction and **GRANTING** the motion to modify the injunction.

Entered: May 28, 2015

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge